[Crim. No. 2373.   Second Appellate District, Division One.—August 24, 1933.]

## THE PEOPLE, Respondent, v. JOHN CHWISTEK, Appellant.

Thomas W. Cochran for Appellant.

U. S. Webb, Attorney-General, and John D. Richer, Deputy Attorney-General, for Respondent.

DESMOND, J., *pro tem.*—Defendant was convicted by a jury of first degree murder and sentenced to state prison for life, in accordance with the recommendation returned with the verdict. From the judgment and an order of the trial court denying a motion for a new trial this appeal is taken.

It is contended that the evidence was insufficient *to* sustain the verdict of first degree murder or any homicide of a higher degree than manslaughter, and that therefore the verdict was contrary to the law and the evidence; also, that the trial court erred in not reducing the crime to manslaughter, under provisions of section 1181 of the Penal Code, paragraph 6, it being urged that upon consideration of the evidence and the law such action should now be taken by this court. It is incumbent. upon us, therefore, to review the circumstances surrounding the commission of this offense.

On December 22, 1932, the defendant, a mechanic by trade, was engaged in the bootlegging business, having been,

as he claimed, unable to secure other employment. Working for him was one Frank Tschurl, a brother-in-law of the deceased, Frederick Kasprovitz. Tschurl testified that about 7 o'clock of the morning of the date mentioned, while he was in the house occupied by himself and defendant, the latter told him of his suspicion that Kasprovitz had been involved in a raid made upon defendant's place of business; that with a customer named Joe they consumed two pints of whisky between 7 and 8:30 A. M., defendant taking about eight drinks and also drinking some wine, all without eating any breakfast; that defendant was in his opinion intoxicated, but apparently in his accustomed jolly frame of mind when he left the house, not later than 11 A. M., having meantime taken a bath and appearing when about to leave the house with an automatic revolver in his hand, which the witness tried unsuccessfully to persuade him to leave at home, the defendant saying, ''Now, I am going to go out and find out things and do things.'' There was testimony to the effect that defendant frequently carried several hundred dollars on his person and often went armed. The wife of the deceased testified that shortly before 1 P. M., seeing defendant on her back porch while she was in the kitchen with her husband, she said, ''Here comes Johnnie. Come in''; that the defendant entered the kitchen, took a position within a few feet of the deceased, who was standing in the kitchen smoking a pipe, and asked him, ''How much money did you get from Frank?'' Upon Kasprovitz denying that he had received any money, defendant, according to Mrs. Kasprovitz, called him some vile names and drew a gun from his overcoat pocket, whereupon Kasprovitz said to his wife, ''You see he is so yellow he needs a gun to talk to me''; that while defendant held the gun pointed at Kasprovitz and was uttering the words, ''You are damned right and I will give you plenty,'' she got between the two men, telling defendant he did not need the gun and that he had better go out and get out; that her husband moved her to one side and defendant thereupon backed out of the house and down the steps, Kasprovitz following him unarmed and step by step till they both passed down the back steps into the back yard to a point where defendant had parked his car; that there their voices subsided as they talked Polish, a language which the witness did not understand, for about ten minutes, during which

time she "thought they made up, because they did not holler any more; neither one of them hollered"; that she then heard shots fired and ran toward the door and "that is where Fred met me". The record of Mrs. Kasprovitz's testimony at this point reads as follows:

"Q. When you ran towards the door, which door did you run towards? A. To the screen door. Q. And how many shots did you hear fired? A. There was four shots, yet it sounded like three, it was so fast; it was awfully fast. Q. Then you say you ran towards this door? A. Yes, and that is where Fred was; he was coming in, and I was going out. Q. He had already come up the steps? A. Yes. Q. Now, when the shots were fired, will you state whether or not Fred was still out in the yard, or was he up on the porch at that time? A. I think the shots were still going when he was coming; that is the way it seemed to me. Q. I see; and what is the next thing you saw when you met Fred there at the door? What was the next thing that was done? A. He said, 'He got me; he got me'; he says, 'Call the police.' Q. Did he have his pipe at that time? A. He still had the pipe in his hand."

It is undisputed that one of the bullets fired by defendant entered the abdomen of Kasprovitz and caused his death, the evidence indicating that shortly after entering his home, on being shot by defendant, he went first toward the telephone and then out a door and fell to the ground, where at about 2 P. M. a police officer saw him still alive but unable to talk. The jury was taken to view the premises and had an opportunity to observe the kitchen of the Kasprovitz home, the back porch, the screen door of the porch, the back steps and the back yard. Their attention was there directed to three holes appearing respectively, first, in the main portion of the house, that is, to the left of the porch at a point midway between the window and the edge of the house; second, in the wood panel of the screen door of the porch, and third, in the door jamb of the screen door. The witness Tschurl identified three bullets which were received in evidence, as to which, quoting from appellant's brief, "He stated that he had dug the smaller one from the siding of the house near the driveway about two feet from the end of the house and about four feet or four and a half feet above the ground. That he had taken one of the other bullets from

the screen door out of the panel at a height of about two feet, and that the third bullet had been taken out of the frame up in the corner of the same door; and that when he had extracted the bullet it had been necessary for him to open the screen door to remove it.''

After the shooting defendant ran through back yards and over fences and down a railway right of way to a lumber-yard where a police officer, one Magness, later found him hiding under a pile of lumber, at that time having in his pocket the automatic revolver which he had used with such deadly effect, and which still contained two bullets. To this officer defendant had first stated that he had no gun and that he had not done the shooting; later, on being asked by the officer why he shot the man, said that ''Fred had double-crossed him and that he was a dirty stool pigeon.'' At this time defendant asked the officer to take him to a hospital so he could undergo a sobriety test, Magness merely replying that the doctor at the police station could look him over, if he needed such a test. This officer testified that in his opinion defendant, at the time of his arrest, was not intoxicated to such a degree that he did not know what he was doing. He further testified as follows: ''A. I asked the defendant, again, the circumstances regarding the shooting, as to where he was when he fired the shots, and where Kasprovitz was when he fired the shots, and why he shot. The defendant stated that Kasprovitz was a prizefighter and he was afraid of him. He came towards him; he was coming towards him; and he backed down the steps; and he said Fred put his hand in his pocket like he was going to draw out a gun, and that he beat him to the draw. He said he was afraid that Kasprovitz was either going to hit him or he was going to shoot him. . . . And I asked him why he thought Kasprovitz was going to shoot him. Well, he said he knew that Kasprovitz carried a gun; he was known to carry a gun; and he said, 'You go search the house, and you will find a gun.' Well, I went in and search the house, the lower portion of the house, and found a gun.'' He also testified that he found the body of the deceased upon the sidewalk and that he did not see any weapon on the body. Another officer, Harry Burch, gave the following testimony: ''I asked the defendant if he had shot Fred Kasprovitz with a 25 automatic; and he said that

he had. I asked him if he had shot him, that day, in the afternoon; and he said that he had. And I asked him why he shot him; and he said that Fred was a 'dirty rat'. I asked him to show me where he and Fred were standing at the time that he shot him; and he showed me. And I asked him if the shells—where the shells would fly from the gun after they were ejected; and he picked up some shells and showed me. He said those were the shells.'' The witness then identified three shells as the ones picked up by the defendant on that occasion and they were marked in evidence. He then continued with the conversation as follows: ''I asked the defendant if he had at any time seen a gun on the person of Fred Kasprovitz, and he said he had not.'' (Rep. Tr., pp. 191 to 194, inclusive.)

Mr. Rex McCormick, a neighbor of the deceased, testified that just prior to his observing the defendant in flight, he had heard four shots, ''two shots, and about two seconds later there were two more shots''; further, ''when I heard the last two shots I started for the front door, and as I did, I saw this man go back through the driveway''. This witness stated that Magness, the police officer, asked defendant why he had shot Kasprovitz and defendant said he had done to him ''just like all stool pigeons ought to be done to''.

The defendant's version of his meeting with the deceased in the Kasprovitz kitchen differed from that of Mrs. Kasprovitz in that he said, ''Fred, did Frank give you any money, or did you make any money on the case that I had?'' to which Kasprovitz replied, denying in profane language that he had made any money on the case, calling defendant a yellow rat and saying to his wife, ''Look at him, he has got his hand in his pocket.'' He stated he was afraid of deceased because he saw a gun in his hand and thereupon produced his own gun and aimed it at Kasprovitz, Mrs. Kasprovitz then coming between them. Immediately thereafter while on the back porch he realized that what he saw in the hand of the deceased was not a gun, but a pipe.

As to the actual shooting the defendant testified that as he turned and tried to open the door of the automobile and enter it, Kasprovitz made a quick move, turned around and jumped up closer to the car, and while they were shifting their positions, ''Pulling his right hand back. I thought that he went after a gun; and, at the same time, he reached with

his left hand and got hold of my hand. Q. Got hold of which hand of yours? A. Of my right hand, with his left hand. Q. And did you have anything in your right hand at that time? A. I had a revolver. Q. What did he do in relation to your right hand? A. He jerked my hand and at the same time the shots fired. Q. Well, why did you fire the shots? A. I was excited, and I don't mean to fire, but when he jerked my hand it just happened that I pulled on the trigger and it went off. Q. How far away was he from you at that time? A. About one foot." (Rep. Tr., pp. 303 to 306, inclusive.) He testified further as follows: "Q. Do you remember how many shots you fired? A. I fired— I am sure of firing one, when he got hold of my hand, or two. Q. Are you sure of any more than that? A. Yes; when he jerked me, then I jerked myself back and I almost fall down at that time; and I pulled myself towards to the house, and I fire one or two more shots, I do not remember. Q. Now, what was your mental state at that time? A. What do you mean by 'mental state'? Q. Were you excited or not? A. I was, yes; I was very excited. Q. And in what way did that show itself? A. I got scared. Q. Got what? A. Well, I was afraid, when he was coming for me, all that time; and then when I heard the shots—when I fire, I got scared all together, all excited; I didn't know what I was doing." Further testimony was as follows (Rep. Tr., 320) : "Q. Now, during that period (i. e., while he was backing down the steps and through the yard to the point where his car was parked) did Fred Kasprovitz, at any time, after you had started and up to the time as you came to the automobile, say anything? You may take the stand. A. Yes, sir. Q. What did he say? A. He said, 'You son-of-a-bitch! I get you, this time.' Q. And when did he say that? A. When he was on the steps. Q. You mean the steps from porch 2? A. From the porch to the driveway. Q. And when you got to the automobile, what did he say then, if anything? A. I asked him to get away from me. I say, 'Fred, please let me go; I did not come in here to fight with you; I come in here to talk with you.' He say, 'You son-of-a-bitch, this is the last time you talk to me.' Q. Now, what did you say, if anything? A. Well, I could not say anything, because just about that time he jumped for the gun. Q. What was the state of your mind at that time, when he jumped for

the gun? A. I tried to beat it away. Q. What was the state of your mind? A. I understood that he was going to beat me or kill me, or beat me up. Q. Were you afraid? A. Yes, sir. Q. How great was your fear? Can you describe the degree of your fear? . . . A. Well, I was so afraid that I did not know just what to do.'' The defendant also stated that certain threats which had previously been made against him by deceased, who was considerably larger and more powerful than himself, together with what he had heard about Kasprovitz's brutality, had made him very much afraid of the deceased.

Counsel for appellant contends ''that the evidence failed to show a crime of any greater degree than that of manslaughter'', arguing that defendant did not have an immediate intention of taking the life of the deceased ''or that he would have shot him the instant he pulled his gun in the kitchen of the deceased's home'', further that ''Assuming for the sake of argument, but without conceding same to be a fact, that defendant went to the home of the deceased with murder in his heart, with a deliberate, wilful and premeditated intent to take the life of the deceased, the facts proved clearly show that such intent, if any, was abandoned either through fear of the deceased or the cooling of the defendant's anger or for some other reason, possibly a realization of the possible consequences, the intent was completely abandoned by the defendant and when he was told to leave the house by Mrs. Kasprovitz he immediately complied, but the deceased, who was a much larger man and very powerfully built, followed him step by step holding his pipe in his hand (the exact position of which does not clearly appear from the testimony, other than from the testimony of the defendant) and when Mrs. Kasprovitz attempted to step in between them, the deceased curtly told her to get out of the way and pushed her to one side continuing to advance toward the defendant. Thus they reached a point in the vicinity of the defendant's automobile and appeared to Mrs. Kasprovitz to be talking in friendly tones as their voices were no longer loud and angry, and they stood there conversing in Polish for several minutes. She could see their faces and testified that she thought the quarrel was all over from their expression and voices, but she could not see anything but the faces of the two men. By a fair interpreta-

tion of this testimony there was some evidence not only that the defendant abandoned any design or intention, if any, to take the life of the deceased, but that he attempted to retreat and that the deceased thereupon became the aggressor.''

Answering this contention, it may be that the jury concluded that Kasprovitz's action in moving his wife to one side and following the defendant with his gun still in evidence down the steps was taken for the purpose of getting Mrs. Kasprovitz out of an extremely dangerous position; in fact, realizing that the defendant at all times after first entering the kitchen had his gun drawn and that the deceased at no time had any weapon, it is difficult to conceive of his position as being that of an aggressor. On the theory that in some way this case presents an instance of self-defense, counsel invokes the doctrine of *People* v. *Knapp,* 71 Cal. 1, 9 [11 Pac. 793], saying: ''The defendant was therefore entitled to have his testimony considered as bearing on the question of self-defense, and even though his testimony should fail to show a complete justification for the killing it would be sufficient in the absence of any other testimony bearing on the question to raise a reasonable doubt in the minds of the jurors as to the degree of the crime, whether it were manslaughter or murder. Section 1097 of the Penal Code reads as follows: 'When it appears that the defendant has committed a public offense, and there is reasonable ground of doubt in which of two or more degrees he is guilty, he can be convicted of the lowest of such degrees only.' It might be contended by the prosecution that the jury were entitled to disbelieve the testimony of the defendant as to the circumstances of the actual shooting, but in that event there is left no testimony whatsoever as to the facts and circumstances immediately preceding the shooting and a verdict of first degree murder based upon such circumstances cannot be sustained.'' Citing *People* v. *Howard,* 211 Cal. 322 [295 Pac. 333, 71 A. L. R. 1385].

The closing language of this argument brings us face to face with the vital point of this case. We do not agree that the testimony of the defendant, as given on the stand, was the sole testimony upon which the jury was bound to base its verdict. The jurors had a right to consider the fact that immediately after the shooting defendant fled and that

when apprehended by the officers, instead of saying that the death was the result of an unfortunate accident or that he shot in self-defense, he stated that he had killed the deceased because he had double-crossed him and was a dirty stool-pigeon; also that when asked later by the Police Officer Burch, "Why did you shoot Fred Kasprovitz?" he said, "I don't know. I will get the rope for this. I killed my best friend." Mrs. Kasprovitz also testified that when the officers brought the defendant back to the house, when he was crying, he said, "I killed my best friend for nothing, that is all." Finally, it must be said that the jury may have considered as amply proven the fact that while the two men were close beside each other just prior to the shooting, the deceased immediately thereafter made his way up the back steps and as he or his wife opened the screen door to admit him to the house, one of at least three bullets fired by the defendant in the direction of and against the house which was at an elevation of several feet above the yard, entered the jamb of the screen door, while that door was open. All this discloses a situation where the jury could have found beyond a reasonable doubt that deceased, running or attempting to run away from defendant and on his own property and unarmed, was pursued by a rain of bullets. Taken in conjunction with the testimony of the witness McCormick as to the sequence of the firing of the shots, "Two shots, and about two seconds later, two more shots," Mrs. Kasprovitz's statement, "I think the shots were still going when he was coming" and appellant's own testimony, "Yes, when he jerked me, then I jerk myself back, and I almost fall down at that time; and I pulled myself forward to the house, and I fired one or two more shots, I do not remember," the facts recited placed the jury in a position where they had before them as evidence bearing on the degree of the crime physical facts and various conditions other than defendant's testimony that the shooting was either an accident or resorted to in self-defense. Can it be said, then, that there was no evidence to sustain the verdict of first degree murder, as defined in section 189 of the Penal Code?

*People* v. *Bowman*, 81 Cal. 567 [22 Pac. 917], lays down the principle that "it is the province of the jury to determine from all the facts and circumstances in evidence whether the killing is accompanied by all the ingredients

which go to make up the crime charged"; and in *People* v. *Traichoff*, 26 Cal. App. 659 [147 Pac. 1178], we find the following language: "There need be no appreciable space of time between the intent to kill and the act of killing. It is only necessary that the act of killing be preceded by a concurrence of will, deliberation and premeditation on the part of the slayer; if such is the case, the killing is murder in the first degree (citing cases); and the question of whether or not the defendant in this case acted with deliberation or premeditation in the act of killing was under the circumstances just narrated clearly a question of fact for the jury."

In considering the motion for a new trial and the request that the offense be reduced from first degree murder to a lesser or included offense, the learned trial judge in this case, after postponing action for several days and exhaustively summarizing the evidence, decided that under the law and the evidence he was not justified in granting the motion for a new trial or in reducing the offense. Taking the same view, we hold that the judgment and order must be affirmed, and it is so ordered.

Conrey, P. J., and York, J., concurred.