[Crim. No. 3814. In Bank.—December 31, 1934.]

THE PEOPLE, Respondent, v. TELLIE McQUATE, Appellant.

J. A. Donnelly for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

CURTIS, J.—The defendant pleaded guilty to the charge of murdering one Ella Straw, and the court fixed a day for the taking of evidence for the purpose of determining the degree of the crime. The defendant did not take the witness-stand either at his preliminary examination or at the hearing before the trial court to determine the degree of the crime to which he had pleaded guilty. There was no eye-witness to the crime. However, shortly after his arrest the defendant made an extended statement which was taken down by a shorthand reporter. In this statement, he admitted the killing of Ella Straw, and detailed the circumstances surrounding the commission of the crime. This statement is relied upon by the prosecution as evidence of defendant's guilt, and defendant also relies upon it as showing that he is guilty of murder in the second degree only, and that the trial court erroneously found him guilty

of murder in the first degree and imposed upon him the death penalty.

From the statement of defendant, which was admitted in evidence against him without any serious objection on his part, it appears that the defendant, a man of forty-four years of age, was living with the deceased Ella Straw in the latter's home in San Diego. Mrs. Straw was at least seventy years of age, possibly a few years older. She had lived in San Diego for some years previous to meeting the defendant. Something like a year and a half before her death, Mrs. Straw became acquainted with the defendant, and notwithstanding the disparity in their ages, they began living together as husband and wife in the home of Mrs. Straw. They occupied the same room and slept together in the same bed, until about a month before the death of Mrs. Straw. The defendant during this time went under the name of Thomas M. Jones, although subsequently he gave his true name as Tellie McQuate. Mrs. Straw owned her home and also three other houses which she rented, and supported herself from their rental. The defendant had no regular employment. In fact, during the time he lived with Mrs. Straw he followed no remunerative employment whatever. The only work he did was performed upon Mrs. Straw's property in repairing and painting some of the buildings thereon. Mrs. Straw supplied him with money to meet all his needs. In fact, she was more than liberal in providing the defendant with clothing and spending money. On the evening of October 8, 1933, which was Sunday evening, they attended a mission on Twelfth Street in the city of San Diego. On the way home from the meeting, they stopped at a market and made a few small purchases. After reaching home they had some sandwiches and drank some beer and then went to bed. At the market where they had stopped on their way home from the mission, the defendant had spoken to another woman. This incident seemed to have furnished the basis of a quarrel between the deceased and defendant after their return home. They continued to argue and quarrel after they had gone to bed, although at that time they were occupying separate rooms. Shortly after retiring, the defendant got out of bed and went to the kitchen to get a drink. In doing so, it was necessary for him to pass through the room of the deceased. The

quarrel between himself and the deceased was still in progress, and when the defendant, on his way back from the kitchen, reached the bed in which the deceased was lying, he picked up a hammer, which was lying near her bed, and hit the deceased over the head two or three times. The defendant then attempted to talk with the deceased, but she made no reply. The defendant was of the opinion that she was dead. He covered her with the bedclothes and then went to bed. He slept until about 8 or 9 o'clock the next morning. He got up about 10 o'clock, cooked breakfast for himself, and, after eating breakfast, went out into the yard, worked around the yard and watered the flowers. This was on Monday morning, October 9th. On Wednesday or Thursday, he attempted to dig a grave under one of the houses owned by Mrs. Straw, in which to bury the body. He left off digging the grave when he struck hardpan, as he feared the burial of the body in such a shallow grave would lead to its early discovery. After abandoning the plan to bury the body the defendant decided to throw it into the bay. Accordingly, so his statement relates, he dismembered the body some time on Saturday, October 14th. He first, with a knife and saw, cut off her lower limbs, and then cut in two each limb by severing it at the knee joint. He then wrapped the dismembered portions of the body in two packages, the disjointed lower limbs in one package and the body or torso in the other. Each package was wrapped in a heavy sack, around which was wrapped oilcloth. Defendant then borrowed an automobile and transported these two packages down to one of the piers on the waterfront and threw them into the bay. He returned the automobile to the owner, and the next morning went down to the bay and saw the body, as wrapped in those two packages, floating upon the water. While there he saw some "navy boys" picking up the "sacks". He went up town and later attended a show, and as he was coming out of the show at about 5 o'clock in the afternoon he bought a daily paper containing an account of the finding of the body of Mrs. Straw and stating that he was wanted for her murder. He immediately hired a taxicab and was driven to Los Angeles. Before this, however, he abstracted from Mrs. Straw's purse $250, which he took with him to Los Angeles, together with $60 of his own money.

He was arrested in Los Angeles some seven months thereafter, to be more exact, about the 27th of May, 1934. At the time of his arrest, he was sitting in the plaza, when an officer noticed a billy or blackjack in his possession. He was taken in charge by the officer by reason of having such an article in his possession, and thereafter by some means not clearly shown in the record, his connection with the murder of Mrs. Straw was ascertained, with the result that his prosecution for that crime followed.

In the statement of the defendant he told how he took the body of Mrs. Straw from the bed, where it lay after she was killed, into the bathroom, where he dismembered it as related above, and that after he had placed the dismembered parts into the two packages or sacks that he had washed out the bathtub and also hosed out the house, removing all blood stains or other evidence of his crime.

In addition to the statement of the defendant, other evidence was admitted at the hearing before the trial court. After the two sacks containing the dismembered body of the deceased were rescued from the waters of the bay, and on the day of their recovery, which was Sunday, October 15th, two doctors, one of whom was a deputy county autopsy surgeon and the other of whom was assistant police surgeon of the city of San Diego, performed an autopsy on the body of said deceased. On the same day, the autopsy surgeon to the coroner of the county of San Diego examined the body after the autopsy. The substance of the evidence of these doctors was that there were six severe lacerations of the deceased's scalp, indicating that she had received six heavy blows on her head; that she had an exceedingly thick skull; that the blows did not fracture the skull; that there was but a slight hemorrhage of blood in the brain; that the deceased did not come to her death as a result of the blows on her head, but from hemorrhage due to the amputation of her lower limbs; and that she had not been dead more than forty-eight hours, and possibly not more than twenty-four hours, at the time the autopsy was performed. Besides the testimony of these doctors, one of the neighbors of the deceased testified positively of seeing and conversing with her on Thursday next preceding the Sunday on which her body was found in the bay, and was quite positive that she saw the deceased and defendant walking together on the

following Friday. She, however, would not be absolutely positive that she saw deceased on Friday. Witnesses also testified that they had visited the house under which defendant stated that he attempted to dig a grave, and found the condition there exactly as described by the defendant.

Practically the sole contention of the defendant is that the testimony adduced at the hearing held for the purpose of determining the degree of his crime did not adequately show a wilful, deliberate and premeditated killing so as to establish first degree murder, as defined by section 189 of the Penal Code of this state. This contention, in our opinion, is not tenable. It is true that the defendant in his statement claimed that he only struck the deceased two or three times, and that he did so with no intent of killing her, but for the purpose of quieting her and stopping the quarrel in which the two were then engaged. But her condition after her death showed that she had received six severe blows on the head, lacerating her scalp and severely injuring her skull. The presence of these six severe wounds on the head of the deceased completely refutes the claim of defendant that he struck deceased simply for the purpose of quieting her, and affords ample justification for the inference that he inflicted the fatal blows with the intent of killing the deceased. That he did not succeed in producing her death by these means, but later she bled to death as a result of his amputating her lower limbs before her life was extinct, only aggravates his crime, and shows a deliberate purpose and intent to take the life of the deceased. Another fact we think is worthy of consideration which, when viewed in the light of all the other facts and circumstances in the case, places the defendant in a most unfavorable situation. The defendant stated that after he had killed the deceased on Sunday evening, the 8th of October, he attempted on Wednesday or Thursday following to dig a grave under one of the deceased's houses, in which to bury the body. We have already referred to the evidence of the doctors to the effect that the deceased had not been dead more than forty-eight hours at the time her body was recovered from the bay and the testimony of one of the neighbors that she saw the deceased on Thursday of the week of her death. This evidence would tend to show that the defendant killed the deceased not earlier than Friday, and

that in digging the grave under the house on Wednesday or Thursday he was planning for the disposition of the dead body of the deceased before he killed her and not after her death. If such was the fact, and we think the evidence justifies such a conclusion, then a clear case of wilful and premeditated murder has been made out against the defendant.

Defendant relies upon the cases of *People* v. *Howard*, 211 Cal. 322 [295 Pac. 333, 71 A. L. R. 1385], and *People* v. *Connors*, 124 Cal. App. 216 [12 Pac. (2d) 43], in support of his contention that the evidence before the court showed only a case of second degree murder. In those cases, like the instant case, reliance was placed largely upon the statements of the defendants showing the circumstances and conditions under which the killing was accomplished, and it was held in each of those cases that if the jury should reject the statement of the defendant as to the manner in which the deceased met death, then there would be a dearth of evidence tending to show the conditions as they existed at the time of the homicide and from which it might reasonably be held that the murder was in fact wilful, premeditated and intentional. No such situation is presented in the instant case. There is evidence aside from the statement of the defendant as to the circumstances and conditions under which the deceased met her death which clearly indicates, not only that she was murdered, but that the means used to cause her death were employed intentionally and with due deliberation. We refer, of course, to the evidence of the doctors who performed the autopsy upon the body of the deceased when they testified that the deceased had received six heavy blows upon her head, and that before life was extinct her body was mutilated by the amputation of her lower limbs.

As to the motive or motives which prompted defendant to take the life of his benefactress, for such the evidence shows she was, the record before us is not entirely silent. The defendant in his statement admitted that he had become dissatisfied with the relations existing between himself and the deceased. She asked him to marry her and he refused, giving as a reason for his refusal the fact that they were continually quarreling before marriage and that it was only reasonable to conclude that the same con-

dition would continue after marriage. When they first began living together they occupied the same room and bed and deported themselves as man and wife. Some month or more before the murder, this relationship had become distasteful to defendant, and he refused to continue it and slept in a separate bed in a room adjoining that occupied by the deceased. He admitted that he was getting tired of her. According to his statement, the frequent and violent quarrels were usually occasioned by his attentions to other women. Then the question of her money, we think, may have provided a motive for his taking the life of the deceased. As we have seen, immediately after killing her, he robbed her purse of $250 and fled from the scene of his crime. While it is not indispensable that motive be proven as an element necessary to justify a conviction of one charged with crime, the presence or absence of motive is a circumstance going to the question of the guilt or innocence of the defendant. In this case we think the evidence is such as to warrant an inference that the defendant may have been actuated in taking the life of the deceased, either by a desire to end his relations with her, which had become distasteful to him, or for the purpose of robbing her of her money. Probably both of these motives had some part in causing the defendant to decide to take decedent's life. But independent of any evidence as to the motive of the defendant, we are in accord with the trial court in its conclusion that the evidence showed that the defendant was guilty of murder in the first degree. The judgment should therefore be affirmed and it is so ordered.

Waste, C. J., Seawell, J., Shenk, J., Preston, J., and Langdon, J., concurred.