[Crim. No. 2259.   First Dist., Div. One.   Aug. 30, 1943.]

THE PEOPLE, Respondent, v. MARY SLATER, Appellant.

Sol A. Abrams for Appellant.

Robert W. Kenny, Attorney General, and David K. Lener and Elizabeth Palmer, Deputies Attorney General, for Respondent.

KNIGHT, J.—The appellant, Mary Slater, was accused by information of having murdered Lucien Doyen, and she was found guilty by a jury of murder of the second degree. Motions for arrest of judgment and a new trial were denied; likewise a motion that the judgment be modified by reducing the degree of crime to manslaughter. Thereupon appellant was sentenced to imprisonment for the term prescribed by law in the California Institution for Women. From the judgment of conviction and the order denying her motion for new trial she has appealed. The several grounds urged for reversal are that the verdict is contrary to law and the evidence, and that at the most the evidence establishes no greater degree of crime than manslaughter; that the trial court committed prejudicial error in giving and refusing to give certain

instructions and in ruling on the admissibility of evidence; and that the assistant district attorney was guilty of prejudicial misconduct during the course of the trial.

At the time of trial appellant was past 68 years of age, and lived with her nephew, Clifford Slater, in an upper flat at 1569 Grove Street in San Francisco. Doyen was 38 years old and lived in the lower flat with his wife, their infant child and Mrs. Doyen's two daughters by a former marriage, aged respectively 12 and 16 years. Shortly after one o'clock on the afternoon of July 15, 1942, during an altercation between Doyen and appellant, appellant fired a shot from a pistol, from a bedroom window in the upper flat. Doyen was standing on an open back stairway leading from the upper flat down past the door of the lower flat to the basement, and the bullet struck him in the chest, killing him almost instantly. Appellant's defense at the trial was in substance that on account of the previous altercations and quarrels that had taken place between them, and because of Doyen's threatening and abusive attitude toward her, and having been previously informed that Doyen was of a violent and quarrelsome disposition and was regarded by people with whom he worked as being mentally queer, she feared on this day that he was about to break into her apartment to do her violence; that she used the pistol to frighten him away, never intending to injure him; and that she did not know that she had shot him until after the police arrived. Her version of the shooting will be hereinafter set forth in greater detail.

The following are some of the essential facts as they appear from the record relating to the background of the case: Appellant had been married, but some 17 years ago had taken back her maiden name, Slater. Her nephew was 40 years old, and had been making his home with his aunt for the past 20 years. He was employed as a storekeeper at the Southern Pacific Hospital, and had been working there for 16 years. For about 16 years appellant had been suffering from a heart ailment, and off and on during that time had been under the medical care of Dr. Humber, for many years a member of the medical staff of the Southern Pacific Hospital and for 12 years the superintendent thereof; and because of such ailment she was doubtless made nervous and irritable. For more than 15 years she had been a member of the West Side Christian Church, and several members of the church testified as to her good reputation for truth, honesty and integrity, and

for peace and quiet; and no rebuttal witnesses were produced by the People on that issue.

Doyen also was employed at the Southern Pacific Hospital, as a waiter. He had been working there as such for about 12 years, and the testimony relating to his character was conflicting. Some four or five employees of the hospital testified that his reputation generally was bad—that he was belligerent, disagreeable, and hard to get along with, and that at times he was violent, and had engaged in altercations and fights with other employees. However, the business superintendent of the hospital, the chief roentgenologist, a former interne, and a neighbor testified as to his good reputation.

Appellant and her nephew moved into the upper flat in December, 1941, and shortly afterwards appellant's nephew learned for the first time that Doyen was the tenant of the lower flat. Later on several quarrels and altercations took place between appellant and Doyen principally over the use of the back yard, the excessive and unnecessary noises and disturbances each claimed the other was making in and about the premises to annoy the other, and about the Doyen's dog, it being claimed by appellant that it was vicious and ran after her, and was permitted to destroy the garden she had started in her portion of the back yard; and the evidence shows that during these quarrels and altercations they called each other names and indulged in hurling opprobrious epithets. Prior to April, 1942, appellant complained to the landlord, saying that if he did not do something about evicting the Doyens she would do something desperate; and in April, 1942, she gave notice she was going to move. Mrs. Doyen testified that all of the trouble was brought about by appellant's unreasonable and abusive attitude toward them and by her repeated acts in deliberately and intentionally making noises in the upper flat to disturb them, such as by pounding on the floor. At any rate appellant selected another place to live, paid a deposit on it, and packed most of their belongings to move; but on May 23, 1942, she was stricken with a heart attack and went to the hospital, where she remained for 18 days, returning to the Grove Street flat on June 9, 1942. Meanwhile the place on which she had paid the deposit was rented to another tenant, so that she was compelled to live in the upper flat until she could find some other place; and she made no effort to unpack her belongings.

The stairway on which Doyen was standing at the time he

was shot was built in an open light well located on the side of the house about midway between the front and the back of the house. It ran from a small enclosed back porch adjoining appellant's kitchen down past the kitchen door of the lower flat and then on to the basement, and connected with a passageway running from the front of the house to the back yard. The kitchen of the upper flat adjoined the back porch. The door at the top of the stairway leading into the back porch was an old screen door, the panels of which were filled in with some thin material such as cardboard or plywood. The stairway was not straight. It had two spiral turns, one about half way down from the upper to the lower floor, and the other below the level of the floor of the lower flat; and the window of the bedroom from which the shot was fired opened into the light well opposite the porch door leading into appellant's kitchen; and anyone looking out the bedroom window could see a person standing on the stairs anywhere from the top landing down to the landing opposite the door of the kitchen of the lower flat.

Doyen was born in France, and his wife in Basel, on the German border of Switzerland. She was the only eye witness to the shooting and to the altercation that preceded it, and according to her testimony the circumstances were as follows: Shortly before it occurred she and her husband, assisted by her oldest daughter, carried the baby buggy, which was quite heavy, and the baby, which was four months old, down the back stairs into the yard, and Mrs. Doyen then went back into the house to prepare the milk for the baby. The windows of the lower flat were left open and the back door was ajar, so that the draft through the house kept slamming the door. While Mrs. Doyen was preparing the milk she heard a disturbance in the upper flat that sounded "like the ceiling was coming down," the turning over of furniture, and knocking on the floor. Her husband was outside sweeping the back stairs, and he said he would go up and knock on appellant's door and tell her to stop the noise. Taking the broom with him he ascended the stairs and knocked on appellant's door with the broom handle, calling to her to come out so that he could talk to her. He then went back down the stairs and stood at the landing opposite the kitchen door of the lower flat. Almost immediately appellant opened the window of the bedroom and Mrs. Doyen saw that she had a pistol in her hand. Continuing, Mrs. Doyen testified that appellant began

calling them "dirty Germans, and foreigners, and dirty son of bitches"; that her husband replied, "The same goes for you." "Why don't you have some children so it would keep you busy"; that appellant then said, "I am going to kill you," and that her husband replied, "Just try it," whereupon appellant fired the shot and then closed the window; that her husband fell on the stairs, and placing his hand on his chest said, "She shot me." Mrs. Doyen screamed that her husband had been shot, and a neighbor, hearing the shot and Mrs. Doyen scream, phoned for the police. Shortly afterwards two police officers named Fitzgerald and Miller arrived in a radio car and another officer named Donahue came on a motorcycle. Officer Miller went to the rear of the house and up the back stairs and Officer Fitzgerald who was not in uniform went to the front door and rang the bell. It was a glass door, but curtained on the inside. There was no immediate response, but shortly appellant opened the door and came out with the pistol in her hand. Officer Fitzgerald told her he was a policeman, and took the pistol from her. She was then placed in the radio car. Meanwhile Officer Miller had gone up the back stairway and knocked on the back door, and receiving no response he pulled the screen door open by using force, and assisted by another officer succeeded in kicking in the kitchen door. Upon entering they found that appellant had left the house by way of the front door. Within a short time Police Captain McDaniel arrived and was followed by the assistant district attorney and Police Inspectors Corassa and Ahern. Appellant was brought back upstairs and questioned about the shooting, but before they had proceeded far the officers sent for a shorthand reporter and a police photographer, and thereafter the interrogation continued. After it had finished appellant was taken downstairs to the lower flat where Mrs. Doyen was interviewed in appellant's presence. Appellant was then taken in the police car to the morgue for the purpose, so the police stated, of identifying the deceased; following which she was placed in jail.

Much of the evidence introduced by the prosecution in support of its case in chief consisted of the declarations the prosecution claimed appellant had made at the scene of the shooting before the arrival of the shorthand reporter. The evident purpose of this testimony was to show that appellant knew before the arrival of the police that she had shot Doyen, that she had done so intentionally, that she was not excited

and showed no remorse for having shot him, and at that time made no claim that she feared Doyen was going to break into her flat and do her violence.

Appellant denied having made the declarations so attributed to her, and her version of what happened on the afternoon of the shooting differed widely from the one given by Mrs. Doyen. In substance it was as follows: On the previous day she had suffered a heart attack and phoned to Dr. Humber, but he was out of town, and she was told that he would get in touch with her the next day. The next day she was still ill and remained home waiting to hear from the doctor. While she was dressing to go out she heard excessive noises from the flat below, consisting of pounding on the walls, slamming doors, and running and jumping through the house. It kept growing worse, so she turned on the radio and ran the vacuum cleaner over the kitchen floor to off-set the noise. Soon she heard someone shout, ''You coward. Why don't you come out? Come on out, you coward. If you haven't enough noise, I will give you some more.'' She then heard someone running up and down her back stairs and a ''terrific'' banging on her back door as though someone was trying to kick it in. Believing it was Doyen she became terrified, because she thought he was going to break in and do her bodily harm. She was in the back of the house at the time, and she rushed to the bedroom, and looking out the window saw Doyen on the back stairs running up and down ''like a mad man'' kicking and pounding on her back door. She thought first she would leave the house by the way of the front stairs and through the front door, but she realized that by attempting to do so she would have to pass the Doyen's front door. She then began to realize that her back door was fragile; that neither of the two kitchen doors had any locks; that one of them could be easily unlatched and the other had an insecure bolt. She then remembered that she had a .25 caliber automatic pistol under her bed which she had purchased at the Emporium some four years previously for home protection while living at another place. She went back and got the pistol and returned to the bedroom. Looking out she could see Doyen running up and down the stairs, pounding on her door, and when he observed her at the window he began calling her vile names and raised his clenched fist in a menacing manner. He called her such names as ''You dirty old maid,'' ''you dirty old prostitute,'' ''you cannot have children,'' ''There is nobody wants you,'' ''you dirty old whore,'' ''you

dirty old bitch," "damn crazy Seven Day Adventist—religious fool," and kept shouting at her, "You haven't got. enough, then I will give you some more. Being frightened and bewildered she opened the window a short space and held it up with her left hand (the window cord being broken) and she exhibited the pistol so that Doyen could see it, saying, "You see this. Do you see this? You stay away from my door," and she kept repeating this to him. Doyen defied her, shouting, "You go to hell, you dirty old bitch, and you crummy old woman," at the same time coming up the stairs toward her, fisted hand upraised in a menacing way, two steps at a time, like a crazy man, and shouting at her, "I will get you out, you damn coward. I will get you out of there." She was then shaking with fear and was afraid she would drop the pistol down the stairway, and during the excitement the pistol was discharged.

Continuing, she testified that she did not intend to point the pistol at Doyen; that she was thinking that if necessary she would fire a shot at the wall opposite to frighten him away; that during the excitement she must have discharged the pistol, but that she did not know she had shot him; that after the pistol was discharged she saw him turn as if to go down stairs, so she closed the window and locked it. She then went back to finish dressing, but soon she heard more kicking and pounding on her back door. She did not know that the police had been summoned, and believing that it was Doyen trying to break in she took the pistol in her hand and went down stairs, and when she opened the door she found the police; and she claimed that it was only after some questioning that she learned that the bullet had struck and killed Doyen.

Appellant was subjected to a severe and exhaustive cross-examination extending over several sessions of the court, during which it was sought to show that the testimony she had given at the trial was inconsistent with statements made by her to the officers at the flat following the shooting; and for such purpose much use was made by the prosecutor of the transcript of the interrogation and proceedings had at that time, which transcript was offered and received in evidence as part of the prosecution's case in chief. It appears therefrom, as well as from the testimony given by appellant at the trial, that almost at the beginning of the interview in the flat she stated that she ought to have an attorney, that she did not think she "ought to talk," and that she so protested

several times during the interrogation. In fact Inspector Corassa admitted, on cross-examination, that "She said several times she wanted to see an attorney." Finally she went to the telephone and summoned her nephew, and he was present during part of the interview. At the completion of the interrogation the shorthand reporter was directed to read his notes aloud in appellant's presence, and she was then asked if she would sign the transcript after the notes were transcribed. She said she would if it was correct; however the transcript was not afterwards presented to her. It further appears from said transcript and her testimony at the trial that during the interrogation the prosecuting officers asked appellant to assume the posture at the window in which she claimed she was crouched at the time of the shooting, so that photographs could be taken of her in that position; and she declined to do so. An officer then assumed various positions at the window, and she was asked to designate the one she was in when the shot was fired; and she declined to do this also, protesting that she thought she ought to see an attorney.

There was considerable rebuttal testimony given by the police officers respecting these matters, and by Mrs. Doyen in contradiction of appellant's version of the circumstances of the shooting, and of her denials about indulging in offensive epithets. In fact the trial consumed a full month, the transcript of the testimony covering more than 1,200 pages; and as will be seen from the foregoing the evidence is sharply conflicting on essential points. Obviously the jury accepted the version of the shooting as given by Mrs. Doyen; and in our opinion it is legally sufficient to establish that the killing was unlawful. Therefore no useful purpose could be subserved by narrating the evidence in greater detail.

The first assignment of error relating to the instructions involves a group based on subdivision 3 of section 197 of the Penal Code, which provides that homicide is justifiable "When committed in the lawful defense of such person." After examining the instructions given and refused on that subject and considering the points made and authorities cited by appellant respecting this group, we are satisfied that no such error appears as would justify a reversal on any of the points so urged. In support of her contention that the instructions included in this group were erroneous she repeatedly cites the recent case of *People* v. *Zuckerman*, 56 Cal. App.2d 366 [132 P.2d 545]. However, a comparison of the instructions here given with those there given demonstrates

that the instructions here are not open to the objections relied upon and sustained in *People* v. *Zuckerman*. Appellant also complains that the instructions here were couched in such language as conveyed to the jury the impression that the court was of the personal opinion that appellant was guilty and had presented an inadequate defense. A fair analysis of all of the instructions shows, however, that such criticism is not warranted. Moreover and in any event it would seem clear that appellant is not in a position to complain of this group of instructions because at the trial she testified definitely that she made no claim that she shot Doyen in defense of her person. Her testimony in this regard, given on cross-examination, was as follows: "Q. Did you deliberately fire the shot at Mr. Doyen to kill him in self-defense? A. I did not. Q. You did not? A. No, sir, I tried to scare him."

■ The next assignment of error is directed against a group of instructions based on subdivision 2 of said section 197, which provides that a homicide is justifiable "When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors by violence or surprise, to commit a felony, *or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein*." (Italics added.) As will be noted, the defense provided for in the portion of the section above italicized is different and distinct from the one provided for in the first portion of the section; and here appellant's defense was based on the italicized portion thereof. In furtherance of such defense the appellant offered an instruction in which the entire section was quoted, but the court refused to give it. Instead it gave one from which the portion of the section upon which appellant particularly relied in justification for the shooting was omitted. It read as follows: "Homicide is justifiable when committed in the defense of habitation, property or person, against one who manifestly intends or endeavors by violence or surprise to commit a felony, or when committed in the lawful defense of such person when there is reasonable ground to apprehend the design to commit a felony, or to do some great bodily injury, and imminent danger of such design being accomplished." We are of the opinion that the refusal to give the instruction as proposed by appellant was error. In answer to this assignment respondent says: "This [instruction as given] is a fair

statement covering the evidence as produced by the appellant. There is no evidence presented by appellant or anyone else that the deceased manifestly intended to enter appellant's flat. Appellant said that the deceased several times called to her to come out and banged on the door, but not that he was coming in, or attempted to force the door.'' But clearly the testimony given by appellant which has been hereinabove set forth, if believed, would be legally sufficient to support the inference that Doyen's actions were such as would lead a reasonable person to believe that he did intend in a violent, riotous or tumultuous manner, to enter the habitation of appellant for the purpose of offering violence to her; and under well settled rules a defendant is entitled to have an instruction given on his theory of the case, if there is any substantial testimony upon which to base such theory. In addition to the testimony above narrated she stated: ''I was just paralyzed and I was frightened, because, like I said, I realized my doors were not solid or locked. I was not in any kind of a condition for anything like that. Q. What did he do? A. He kept defying me. Q. What was he doing? A. He was shaking his fist at me, and he told me—— Q. (Intg.) What did he do, if anything? A. Well, he kept shaking his fist at me and kept repeating nasty names. Q. Where was he at that point? A. He was on my part of the stairway. Q. Was he moving or standing still? A. He was coming up to me. He started up again, and I kept thinking that maybe I ought to fire the gun in the air so as to scare him. And I thought about shooting into the stairway. And I kept hanging on to the gun. I was afraid I would drop it down the stairway.''

She further testified that on one occasion, when her nephew was on his vacation in the east and she was alone in the flat, she heard a noise at one of her windows; that she looked and saw the lace curtains blowing, and upon going to the window she saw Doyen standing there; that he was looking from one window to the other, and that when he observed her, he turned and went downstairs. The record also shows that prior to the shooting her nephew had told her about the trouble and fights Doyen had with other people at the hospital; that he had used a knife in a quarrel with one man and thrown a plate at another; that he, the nephew, had been told to keep away from Doyen, and that at the hospital Doyen was called ''crazy Lou.''

It is our opinion that in view of the foregoing testimony

appellant was entitled to an instruction embodying that portion of section 197 above italicized, and that the refusal to give the same was error because she was thereby deprived of the right to have the jury give proper consideration to the defense upon which she mainly relied.

■ We are of the opinion also that under the facts related by appellant she was entitled to have an instruction given embodying the first subdivision of section 195 of the Penal Code. The entire section reads: "Homicide is excusable in the following cases: 1. When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent. 2. When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner." The court gave an instruction embodying the second subdivision only, but as contended by appellant, by omitting all reference to the first subdivision the jury may have inferred that it was only in such cases as were covered by the provisions of subdivision 2, that is, when a deadly weapon is not used, that a homicide was excusable; whereas it was her claim that the homicide here was committed by accident and misfortune in lawfully defending her home by lawful means and without any unlawful intent, and therefore excusable.

The objections to the other instructions are without merit. The one relating to expert testimony is in accord with the provisions of section 1127b of the Penal Code; and those given upon the subject of character witnesses appear to be in the usual form. Nor aside from the two instructions already discussed was there any error in refusing the other instructions proposed by appellant. Some of them might well have been given, but the subject matter thereof seems to be sufficiently covered by those given. Furthermore, we find no reversible error in the rulings on the admissibility of evidence, or in the conduct of the assistant district attorney.

■ It is our final conclusion, however, that notwithstanding the errors above pointed out, the record presents a situation calling for the application of subdivision 6 of section 1181 of the Penal Code, which authorizes a court to modify a judgment of conviction by reducing the degree of crime,

without reversing the judgment. (*People* v. *Kelley*, 208 Cal. 387 [281 P. 607]; *People* v. *Howard*, 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385]; *People* v. *La Fleur*, 42 Cal.App.2d 50 [108 P.2d 99]; *People* v. *Castro*, 37 Cal.App.2d 311 [99 P.2d 374].) The first two of the cases just cited were tried by juries. The Kelley case was a death penalty case, and the Supreme Court reduced the degree of crime to manslaughter, the court saying that it could not bring itself to believe that there was a wilful, deliberate and premeditated killing. The court then went on to hold, however, that the evidence established a case of manslaughter; and it exercised the power conferred upon it by section 1181 by reducing the degree of the crime despite the errors occurring during the trial. In this regard the court said: "The errors alleged to have occurred during the trial have not escaped our attention. Were we compelled, as formerly, to either affirm the judgment or reverse the case, we would be driven to the latter course because of prejudicial errors committed." The Howard case was also a death penalty case, and the degree of crime was reduced to second degree murder. There no prejudicial error was found, but the court said: "We are of the view that the record now before us establishes murder of the second degree. *We entertain a doubt* as to its showing murder of the first degree" (italics added); and accordingly the degree of crime was reduced to second degree murder. In each of the other two cases above cited the defendant was tried by the court without a jury, and found guilty of first degree murder with the penalty fixed at life imprisonment. In the La Fleur case the degree of crime was reduced to second degree murder, the court saying: "The evidence adduced at the trial of the instant cause was absolutely sufficient to justify a verdict of second degree murder, *but it was hardly sufficient* to support a verdict of murder of the first degree, when reviewed in the light of all the surrounding circumstances shown by the record. . . ." In the Castro case the degree of crime was reduced from first degree murder to manslaughter, and in so doing the court said: "The attending circumstances neither indicate an abandoned and malignant heart on the part of appellant, nor portray a wilful, deliberate or premeditated killing, but reveal a crime committed 'upon a sudden quarrel or heat of passion,' i. e., voluntary manslaughter." In *People* v. *Wells*, 10 Cal.2d 610 [76 P.2d 493], the Kelley and Howard cases

are cited, and in commenting on some of the language used therein the court said that "it should be made clear that the 'doubt,' if any, like that universally required of the jury on the trial of a criminal action, should be not merely fanciful or imaginary, but should be reasonable, real and substantial."

In the present case, as stated, the evidence is legally sufficient to establish an unlawful killing; but after viewing the case in the light of all the surrounding circumstances as they are shown by the evidence, and especially taking into consideration the fact that the fatal shooting occurred during a heated verbal altercation which started after the deceased went up the back stairs and pounded on appellant's door with a broom handle and shouted to her to come out; also appellant's age and the fact that she was suffering from a chronic heart ailment and the effects thereof, we are not satisfied that the evidence establishes any greater degree of crime than manslaughter. As stated in 13 Cal.Jur. 609, "When a mortal blow is struck upon a sudden quarrel or in the heat of passion, upon adequate provocation, the actual intent is disregarded. In such case, although the intent to kill may exist, it is not that malicious intent which is an essential element in the crime of murder." And applying that doctrine to the present situation, we are not prepared to hold as a matter of law that this is not such a case.

The judgment of the trial court of second degree murder is, therefore, modified, and the cause remanded to the trial court with directions to enter judgment against appellant finding her guilty of manslaughter, and thereupon to pronounce judgment upon her as prescribed by law.

Peters, P. J., concurred.

WARD, J.—I dissent. The provision "if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed" (Pen. Code, sec. 1181, subd. 6; Stats. 1927, p. 1037) was enacted, as noted in *People* v. *Kelley,* 208 Cal. 387 [281 P. 609] at page 392, to prevent a recurrence of the action taken in *People* v. *Nagy,* 199 Cal. 235

[248 P. 906], wherein the evidence proved arson in the second degree rather than the first, which necessitated a reversal and retrial. The first case presented to the Supreme Court involving the amendment (Pen. Code, sec. 1181, subd. 6) in which a modification was ordered was *People* v. *Kelley, supra.* In that case at page 392 the court, realizing the serious effect of applying "judicial commutation" (concurring opinion by Mr. Justice Shenk in *People* v. *French,* 12 Cal.2d 720 [87 P.2d 1014] at p. 776), said: "We have approached the consideration of this new duty with a great deal of hesitation, not only because the duty is one not to be assumed lightly, but also because the amendment to the code section marks a complete departure in our criminal jurisprudence, and one which on first impression seems a startling innovation in our procedure. . . . we are convinced that, but for the miserable circumstances under which the crime was committed, and which no doubt outraged the moral sense of the people of the community in which it was committed, including the jurors, a verdict of murder would not, in all probability, have been rendered."

The majority opinion seeks to use the latter part of the quotation as authority to reduce the judgment of conviction to "a lesser crime included therein." (Sec. 1181.) If it was the intention of the court in the Kelley case to adopt the rule that a judgment in a criminal case should be reduced if it appeared to a reviewing court that the degree of the crime "in all probability" was fixed as a result of the "miserable circumstances" surrounding the commission of the offense, then the court was trifling and toying not only with the constitutional rights of the People of the State of California but also of the defendant in that case. The court had no such intention as the decision is certain and plain in its holding that malice and premeditation in the commission of the offense were lacking and that there was no prejudicial error appearing in the record. At page 393 the court said: "No express malice was shown, for there was not manifested a deliberate, or any, intention to unlawfully take the life of a fellow creature. . . . Appellant was properly found guilty, on competent evidence, of a most serious offense, and the errors complained of did not, in our judgment, prejudicially contribute toward bringing about the finding that he killed Mrs. Mellus. No miscarriage of justice, therefore, resulted, except that, as

a matter of law, the jury improperly fixed the degree of the crime and imposed the penalty therefor.''

In the present case if prejudicial error appears defendant is entitled to a reversal of the judgment. If there is error but not prejudicial this court is prohibited from entering an order of reversal. In *People* v. *Cowan*, 38 Cal.App.2d 231 [101 P.2d 125, 135], at page 246, the court held: ''There are errors of law in the record. In accordance with the mandate of section 4½ of article VI of the Constitution, we have studied the entire reporter's transcript and are left with the firm opinion of the guilt of the defendants and that no injustice has been done to them except in fixing the degree of their crimes. Therefore, under section 4½ of article VI of the Constitution, we cannot reverse the judgment.''

The majority opinion holds that certain instructions might well have been given but throughout the opinion there is not one statement that there was prejudicial error in the trial of appellant and the majority opinion expressly states ''we find no reversible error in the rulings on the admissibility of evidence, or in the conduct of the assistant district attorney.''

The modification of the judgment by reduction of the offense is based upon *People* v. *Kelley, supra* (previously referred to); *People* v. *Howard*, 211 Cal. 322 [295 P. 333, 71 A.L.R. 1385]; *People* v. *La Fleur*, 42 Cal.App.2d 50 [108 P.2d 99], and *People* v. *Castro*, 37 Cal.App.2d 311 [99 P.2d 374], and the statement that ''in the light of all the surrounding circumstances'' the evidence establishes only manslaughter.

In the Howard case the court entertained a doubt also ''shared by the prosecution'' as to proof of murder in the first degree. It must be assumed that in that case the court concluded that murder in the first degree had not been proven to a moral certainty and beyond a reasonable doubt. Certainly it was not intended to hold that a possible or imaginary doubt by a reviewing court would justify a modification. In *People* v. *Wells*, 10 Cal.2d 610 [76 P.2d 493], in discussing the word ''doubt'' as used in the Howard case, at page 627 the court said, ''it should be made clear that the 'doubt,' if any, like that universally required of the jury on the trial of a criminal action, should be not merely fanciful or imaginary, but should be reasonable, real and substantial.'' In the Howard case at page 329 the court said, ''there is a dearth of evidence tending to show the conditions as they existed at the

time of the homicide, and from which it might reasonably be held that the murder was, in fact, wilful, premeditated and intentional. In this regard, the state failed to satisfy the burden of proof." In the present case there is a mass of evidence showing preparation and intent. In the La Fleur case after reviewing the record the court simply held the evidence was sufficient to support a verdict of second degree murder but insufficient to justify a verdict in the first degree. In the Castro case the judgment was reduced to manslaughter.

Whether the evidence "falls short of the modicum required for a conviction of murder in the first degree" (*People* v. *Castro, supra,* at p. 315) in proof of premeditation, etc., is a question that should be approached by a reviewing court "with a great deal of hesitation." (*People* v. *Kelley, supra,* at p. 392.) In *People* v. *French, supra,* at page 775, the test is set forth as follows: "The court has no power where the defendant is convicted of murder of the first degree, in cases where the jury has exercised the discretion imposed in it, to substitute its discretion for that of the jury as to the extent of punishment to be imposed. In cases where the evidence shows that the homicide was committed with deliberation, premeditation and malice aforethought, the crime is murder of the first degree with absolute power in the jury to determine the penalty. That there is evidence to sustain the jury's finding cannot be questioned. That being so, this court is powerless to interfere with the exercise of the jury's discretion." (See *People* v. *Greig,* 14 Cal.2d 548 [95 P.2d 936].)

In a murder case if there is evidence to justify the finding of the jury that the accused knew what he was doing when he took the life of his fellow man the determination of the degree is a question of fact for the jury and not for a reviewing court. (*People* v. *Ross,* 34 Cal.App.2d 574 [93 P.2d 1019].) If the act be preceded by and be the result of a concurrence of will, deliberation and intent the crime of murder in the first degree is proved. (*People* v. *Ross, supra.*)

In the present case the following facts appear: The killing was not committed in the commission of an unlawful act, not amounting to felony or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection and was not the result of a sudden quarrel or heat of passion. (Pen. Code, sec. 192, subds. 1 and 2.) The subdivision relating to the lawful and unlaw-

ful act may be considered only upon the theory that appellant believed that the deceased was about to break into her apartment and inflict violence. The facts, as related in the majority opinion, demonstrate the contrary. When shot by appellant the deceased was standing downstairs without attempting approach toward appellant. The killing was not the result of a sudden quarrel or heat of passion, but rather the culmination of a series of quarrels in which sudden heat of passion played no part as demonstrated by the evidence.

The majority opinion, quoting evidence given by the defendant, or seemingly in her favor, which must have been disbelieved or discountenanced by the jury to arrive at the verdict, evidently reaches the conclusion that appellant and her witnesses were telling the truth, but frankly admits that the jury accepted the version of the shooting given by the wife of the deceased and then states that such evidence "in our opinion ... it is legally sufficient to establish that the killing was unlawful." If the wife's version is legally sufficient, then acceptance of appellant's version is a substitution by the reviewing court of its views and conclusion in place of the conclusion of the jury.

The majority opinion holds that in light of all the "surrounding cricumstances" the evidence establishes only the "degree of crime" of manslaughter. Accepting this view in the majority opinion that the evidence establishes that the killing was unlawful but denying that in light of all the circumstances the unlawful killing established only the offense of manslaughter, I note evidence which appears in the record positively evidencing the crime as murder of the first degree.

The killing was not the result of a sudden quarrel but rather of repeated misunderstandings which ripened into quarrels primarily over some noise that emanated from one of the flats. Appellant occupied the upper, and decedent, with his family, the lower flat of premises on Grove Street. The backyard was divided by a fence five feet high.

Mr. Doyen was born in Paris, and his wife in Switzerland. When the Doyens, parents of an infant, found it necessary to use a washing machine appellant ran a vacuum cleaner over an uncarpeted floor. At times, when a dog barked or the baby cried, appellant turned on the radio to loud blasting sounds. Appellant threatened to kill the small cocker spaniel. Thereafter, whenever the dog disturbed appellant the Doyens

removed the dog to the flat. The wash or clothes pins occasionally fell over the fence and Mr. Doyen would jump the fence to retrieve such articles. Appellant complained to the landlord that if the Doyens were not evicted "she would do something desperate." The landlord advised appellant's nephew that appellant was high strung and cranky and that she should not live near other people. At the trial witnesses were produced to prove the reputation of the Doyens for peace and quiet. Appellant, within a period of approximately four years, occupied seven houses or flats. There is evidence that in other places similar disturbances occurred particularly if the adjoining flat owners happened to be of foreign birth. Appellant's favorite appellations in addressing the Doyens was "dirty foreigners" and "sons of bitches." Appellant's conduct toward the Doyens generally was indicative of not only a malicious, but a vicious disposition.

On the day of the killing, Doyen, in the act of sweeping, slammed a door. Appellant saw Doyen from her front bedroom window. Doyen approached a door and knocked with the use of a handle of a broom. Appellant, after turning on the radio, deliberately walked approximately sixty feet, obtained a loaded deadly weapon, and returned, opened her bedroom window, and, after a short altercation with Doyen, who was down below, called Doyen a "dirty son of a bitch." "I mean you down there," and said, "I am going to kill you." Thereafter, the shot was fired that caused the death of Doyen. Appellant now claims that she shot to scare, but the aim was true at an angle of 45 degrees, the bullet passing through the right chest, going through a portion of the right lung and into the heart without a deflection. After the shooting she closed the window and dressed. From this evidence and the background of ill will of appellant toward Doyen in the face of the admission of the killing the jury was certainly justified in finding "preparation," "premeditation" and "wilful intent." (*People* v. *Wells, supra; People* v. *Campanella,* 46 Cal.App.2d 697 [116 P.2d 633].) The decision of the jury should be final. (*People* v. *Emerson,* 130 Cal. 562 [62 P. 1069].)

Peace officers arrived shortly after the shooting. Appellant was still holding the gun. After being disarmed, though she offered no resistance, she was asked why she used the gun. She replied: "I am not going to let anybody tell me what to

do or shove me around.'' When informed that she had shot Doyen, she was cool and calm and evidenced no surprise. Later when asked to relate the happenings she said: ''Well, I shot that man that lives down stairs.'' Subsequently she referred to the fact that there was some ''irritation''; that the Doyens kept in the alley-way a vicious dog which tore up appellant's plants. When confronted by the widow who identified appellant as the woman who shot her husband appellant commented: ''So what'' and subsequently when her attention was called to the fact that ''You have left that poor woman in there with three children,'' replied, ''Well, I don't care, they are not going to call me any names.''

The evidence in its entirety indicates that appellant was possessed of an abandoned and malignant heart. There is no evidence of immediate provocation for the killing. Words of reproach never justify the use of a deadly weapon and do not warrant reduction from murder to manslaughter. (*People* v. *Manzo,* 9 Cal.2d 594 [72 P.2d 119].) The act was preceded by and was the result of a concurrence of will, deliberation and intent. Under such circumstances in amending section 1181 it is inconceivable to me that the Legislature intended that a reviewing court should interfere through ''judicial commutation.'' This view was followed in the hereinafter cited cases.

In *People* v. *Shaver,* 7 Cal.2d 586 [61 P.2d 1170], the court said at pages 593, 594, 595 and 596:

''There is no principle of law making it obligatory upon the court or the jury to accept appellant's version of the circumstances leading up to the killing. This principle is so well established that citation of authorities in support thereof becomes unnecessary. Evidently the jury refused to believe appellant's statement of the reasons that prompted him to take his wife's life. This was a question exclusively within their province to decide. Having decided the question adversely to appellant, this court is bound by their decision thereof as it is in the case of any other question of fact passed upon by the jury. . . . This evidence was sufficient to justify a verdict of murder in the first degree. (*People* v. *Murphy,* 1 Cal.2d 37 [32 P.2d 635], *People* v. *McQuate,* 2 Cal.2d 227, 233 [39 P.2d 408], and *People* v. *Ottey, supra* [5 Cal.2d 714 (56 P.2d 193)].) However, the case is made much stronger against the appellant when we consider his own admissions that he killed

378

his wife with his own hand, and immediately fled from the scene of the crime. The jury was perfectly justified in accepting those portions of the appellant's statement which appeal to them while rejecting those that they did not believe. (*People* v. *Murphy,* 1 Cal.2d 37, 40 [32 P.2d 635].) With this evidence before us, we are not able to bring ourselves to the conclusion that the judgment against the appellant should be reduced to murder in the second degree.

''It is not necessary for us to discuss at any length the three cases relied upon by appellant in which there was a reduction of the judgment. The case of ·*People* v. *Kelley, supra,* has been given consideration in our opinion in the case of *People* v. *Murphy, supra.* The language used in the opinion in the Murphy case is quite pertinent to the instant case, the two cases having many points of similarity. The other two cases relied upon by appellant are *People* v. *Howard, supra,* and *People* v. *Connors, supra* [124 Cal.App. 216 (12 P.2d 43)]. In those cases the judgments were reduced from murder in the first degree to murder in the second degree for the reason that if the jury should reject the statement of the defendant as to the manner in which the deceased met death, then there would be a dearth of evidence tending to show the conditions as they existed at the time of the homicide from which it might be reasonably held that the murder was in fact wilful, premeditated, and intentional. No such condition exists in the present case as we have shown that if we exclude the entire statement of the appellant, there is then sufficient evidence to show him guilty of murder in the first degree. The instant case is much like the case of *People* v. *McQuate, supra,* where the two cases of *People* v. *Howard* and *People* v. *Connors, supra,* are discussed and distinguished from the McQuate case.'' (*People* v. *French, supra; People* v. *Greig, supra; People* v. *Murphy,* 1 Cal.2d 37 [32 P.2d 635] ; *People* v. *Ross, supra; People* v. *Campos,* 10 Cal.App.2d 310 [52 P.2d 251] ; *People* v. *Chwistek,* 134 Cal.App. 32 [24 P.2d 872] ; *People* v. *Masters,* 133 Cal. App. 167 [23 P.2d 774] ; *People* v. *Green,* 124 Cal.App. 709 [12 P.2d 541] ; *People* v. *McQuate,* 2 Cal.2d 227 [39 P.2d 408] ; *People* v. *Madison,* 3 Cal.2d 668 [46 P.2d 159] ; *People* v. *Fleming,* 218 Cal. 300 [23 P.2d 28] ; *People* v. *Price,* 207 Cal. 131 [277 P. 316].)

This judgment should be affirmed.