[Crim. No. 4017. In Bank.—October 27, 1936.]

THE PEOPLE, Respondent, v. LOUIS R. SHAVER, Appellant.

Willard W. Shea, Public Defender, and Hugh K. Fossman, Assistant Public Defender, for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

CURTIS, J.—Appellant was found guilty by the verdict of a jury of murder in the first degree. In the absence of any action of the jury trying the case fixing the punish-

ment of the crime, the court pronounced judgment of death against defendant. From this judgment and the order denying his motion for a new trial, he has appealed.

The victim of defendant's crime was his wife. The crime was charged to have been committed on September 12, 1934. The parties had been married something over seven years prior thereto. As a result of the marriage they had two children, Richard and Louis. Appellant's wife had been previously married, and at the time of her marriage to appellant she had a little girl named Frances, the issue of her previous marriage. The parties lived in New York for a short time after their marriage, and then came to California, taking up their residence in the city of Oakland. As far back as 1932, the appellant entertained suspicions that his wife had not been faithful to him. Whether there was any foundation for such suspicions is not shown by the evidence. No direct evidence was given by any witness, not even by the appellant, that the appellant's wife had ever been unduly intimate with any member of the opposite sex. She was a fortune teller, and carried on that calling in order to support herself and children. Her followers consisted of men and women, but mostly women. The appellant had no regular employment, and contributed but little, if anything, to the support of the family. In April, 1934, the appellant's wife rented a two-room apartment from Robert G. Lee, in the city of Oakland. The family, consisting of appellant, his wife and the three children, lived in this apartment up to the time of the wife's death, except that appellant left the family on August 4, 1934. He returned later, and on August 29, 1934, Mrs. Shaver rented a room for him on the floor above her own apartment. In the early part of August, 1934, an officer of the Oakland police department was called to the apartment occupied by Mrs. Shaver. He found Mrs. Shaver barricaded in the front room and the appellant in the rear room. Mrs. Shaver appeared frightened and almost hysterical. The children, some of whom were hiding under a table, were also frightened and hysterical. Mrs. Shaver told the police officer that her husband had attacked her on the street with a butcher knife which had been left at the scene of the attack, and that he had followed her home and chased her around the house with a steel, used for sharpening

knives, and that she finally escaped him and barricaded herself and children in the front room. The knife was later found at the place where Mrs. Shaver stated that it had been left. The appellant was taken into custody by the police officer, and a charge of assault with a deadly weapon was lodged against him, but Mrs. Shaver refused to prosecute him and the action was dropped.

On September 11, 1934, one of the appellant's children was brought to the police station at Oakland with a note pinned on his jacket, giving his name and address. The boy was taken to the address, but on finding the doors locked, he was left with Mr. Lee the landlord. The following day, inspector Evans of the police department, visited this address, which was the apartment theretofore occupied by Mrs. Shaver and her children, and found the three children at home. The front room was undisturbed, but in the back room one entire wall was found to be covered with blood. An attempt had apparently been made to wipe the blood from the wall. Blood was found on one of the beds and on one of the chairs in the room. In the kitchen stove was found a 12-inch pipe. Some partly burned rags were found in the stove. In a sideboard was found a 12-inch butcher knife. The inspector also noticed two fresh nails that had been driven into a small door directly under some steps. Against this door, a bed had been pushed. Prying open the door, the inspector found in a heap the dead body of Mrs. Shaver. The autopsy thereafter performed showed some twenty-five bruises, lacerations, stab wounds and fractures upon her body. Among these wounds were a 1½-inch stab wound just below the sixth rib, a 1¼ inch stab wound just below the seventh rib, a 1½-inch stab wound on the left breast, a second 1¼-inch stab wound just below the seventh rib, and a stab wound below the ninth rib, besides a fractured nose and numerous bruises and lacerations upon the eyes, the lips, the ears and scalp of the dead woman. The autopsy further disclosed that the chest and abdominal stab wounds had penetrated the left lung; had punctured the diaphragm five times, the stomach four times and the liver and kidneys once each, and the aorta had been punctured. Death had been due to shock and hemorrhage from the stab wounds in the chest and abdomen.

Some fifteen months after the murder of Mrs. Shaver the appellant was apprehended in Seattle, Washington, and returned to Oakland for trial. Appellant did not take the stand at his trial, but he made two statements, one to the officer who returned him to California and the other to the assistant district attorney. In these statements he admitted killing his wife by the use of the iron pipe and a black-handled knife. He admitted fleeing from the state and going under an assumed name until arrested. In these statements, he gave an account of the trouble between himself and his wife, which led up to his taking her life. We now quote from the signed statement of appellant as follows: ''I got to talking to the wife about a man named Art Hayes. I accused her of being untrue to me and going with Hayes and allowing him to sleep in the house in front of my children. I got wild, and she said to me, 'You old son of a bitch and bastard, the children ain't your children.' I then lost my senses, and I reached over on the dresser and got a piece of one or one and a half inch piece of pipe, nearly a foot long, which was lying on the dresser where the children evidently brought it in from the plumbing shop next door and I hit her on the head with the pipe. I must have hit her two or three times and rushed her over to the bed near the closet. I either took the knife from her or picked it up from the floor. It was a sort of a French knife, with a black handle about a foot long. I stabbed her with the knife and stabbed her a couple of times in the abdomen and also on the left arm. She was still standing either on or near the bed. Believe she was standing in the bed. She fell on the bed when I stabbed her. I then took her off the bed and laid her near the hallway door. I think she was dead at this time. I do not remember if she said anything to me or not. She may have screamed. Louis came into the hall and kept knocking on one of the doors. I do not know what he said. I let him into the front room and shut the folding doors and kept him in the front room. I began to see what I had done, and I went out and picked my wife up and put her into a closet under the stairway going upstairs. I then cleaned up the place and burned my pair of pants in the stove, and also the pipe. I nailed up the closet door. I may have put two or three nails in it. I cleaned the

knife and I think I laid it on the sink after washing things up. After I cleaned up and got myself ready, I took Louis and went to school and called Frances out and gave her fifty cents and told her to get some lunch for her and Richard and told her if she had any money left they could go to a show. I took Louis with me to the bus station where I took a taxi to the park on Seventh street, put a note on Louis and pinned it on. I think I put his name and address on it. I thought someone would take him home and discover this affair. I put my wife in the closet, for I did not want the children to see their mother dead. After I left Louis I went to San Francisco that same night, took a Greyhound bus to Portland.''

The statement of appellant from which this quotation is taken was the one made to the arresting officer who made notes of his conversation with appellant. Thereafter this officer dictated to a stenographer the statement made to him by the appellant, and the latter reduced the same to writing by means of a typewriter, and the typewritten statement was submitted to the appellant who read it over and, after making a few slight corrections, signed the same and delivered it to the officer. It bears every evidence of being made after due and mature deliberation and under circumstances which justify implicit confidence in its accuracy and authenticity. The statement concludes with a narration of the appellant's wanderings after his arrival in Portland until his arrest in Seattle some eighteen months thereafter. The appellant offered no evidence in his defense.

In support of his appeal, the appellant contends first that the trial court erred in admitting in evidence certain photographs marked as plaintiff's exhibits 1, 2, 3 and 4. Exhibit 1 is a picture of the deceased's body as it lay in the closet at the time it was first discovered by the officers. The other three exhibits show the body of appellant's deceased wife in various positions after its removal from the closet. One of these pictures shows the body covered with blood stains, the other two show a number of the stab wounds on the body, and one shows, in addition to these wounds, the long autopsy incision after it had been sewed up. The condition of the body as shown by these photographs in these various positions, had been testified to

by the officers and other witnesses sworn in the case. These photographs only brought out in more bold relief the true condition of the body of the slain woman. While they were evidence of the most damaging character against the appellant, it cannot be said that he was legally prejudiced by their introduction. They simply portrayed facts which the jury were entitled to have brought to their knowledge and, if they impressed the jury more strongly than the narration of these facts by sworn witnesses, no harm in a legal sense was sustained by the appellant, and their admission in evidence cannot be held to be error. Authorities that photographs showing the position and condition of the body of a deceased person are admissible in evidence are numerous. We will only cite three cases recently decided by this court which sustain the action of the court in admitting said photographs in evidence. (*People* v. *Gomez*, 209 Cal. 296, 300 [286 Pac. 998]; *People* v. *Burkhart*, 211 Cal. 726, 732 [297 Pac. 11]; *People* v. *Sisson*, 1 Cal. (2d) 510, 511 [36 Pac. (2d) 116].)

In this connection the appellant complains that the jury were shown exhibit 7, which was a picture of the deceased in her lifetime, while they were looking at photographs of her body after her death. The sharp contrast existing between these photographs taken before and after death, appellant claims, appealed to the passions of the jury and unduly prejudiced them against appellant. The contention is without merit for the reasons stated in the preceding paragraph.

The prosecution called Mrs. Louise Gravatt, who testified that the Shavers in 1932, two years before the trouble which resulted in Mrs. Shaver's death, lived in an apartment house kept by her, and on one occasion while the couple were residing there the appellant had accused his wife of being with another man, when in fact the wife was in a nearby park with her children and no other man was present. The only objection to this evidence was the remoteness of the time from the occasion testified to and the time when the present crime was committed. Appellant admits that remoteness of time is generally not sufficient to exclude evidence otherwise admissible, but calls attention to the fact that so far as the record shows the parties lived in conjugal harmony for almost two years thereafter, and

that evidence of their former troubles only tended to inflame and prejudice the jury against appellant. This evidence bore out the theory of the prosecution that the appellant was without cause jealous of his wife and falsely accused her of associating with other men, and that acting under such emotions, he took her life. The remoteness of this evidence might lessen its weight, but did not render it inadmissible. (*People* v. *Gosden,* 6 Cal. (2d) 14 [56 Pac. (2d) 211].)

We cannot say that the trial court abused its discretion in denying appellant's motion for a new trial on the ground of newly discovered evidence. Even had the newly discovered evidence been admitted, it would not, in our opinion, have changed the result of the trial.

Finally the appellant contends that the trial court erred in refusing to reduce the judgment of murder in the first degree to murder in the second degree or manslaughter, and appellant now asks this court to make such a modification in said judgment. The power to so reduce the verdict is given to the trial court and also to an appellate court by subdivision 6 of section 1181 of the Penal Code, and it has been exercised by this court and the District Court of Appeal. (*People* v. *Kelley,* 208 Cal. 387 [281 Pac. 609]; *People* v. *Howard,* 211 Cal. 322 [295 Pac. 333, 71 A. L. R. 1385]; *People* v. *Connors,* 124 Cal. App. 216 [12 Pac. (2d) 43].) Appellant relies upon these cases in support of his contention that his crime should be reduced either to murder in the second degree or manslaughter.

Appellant presents this contention from two different angles, (1) That the court should and must accept appellant's version of the circumstances leading up to the killing which would make the offense that of manslaughter only, and (2) That if the court rejects the appellant's version of the circumstances surrounding the killing as the prosecuting attorney asked the jury to do in his argument, the record will only support murder in the second degree.

There is no principle of law making it obligatory upon the court or the jury to accept appellant's version of the circumstances leading up to the killing. This principle is so well established that citation of authorities in support thereof becomes unnecessary. Evidently the jury refused to believe appellant's statement of the reasons that prompted

him to take his wife's life. This was a question exclusively within their province to decide. Having decided the question adversely to appellant, this court is bound by their decision thereof as it is in the case of any other question of fact passed upon by the jury.

We now approach the second angle upon which the appellant presents his contention for a reduction of the judgment,—that is, if we reject the version of the appellant as to the circumstances under which he killed his wife, the evidence will only support a judgment of murder in the second degree. If we reject entirely the statement of the appellant as to his connection with the death of his wife, the remaining evidence in our opinion points irresistibly to him as the perpetrator of the crime, and that in killing his wife he was guilty of murder in the first degree. In the first place, the evidence shows that the appellant for a long period of time had made accusations of improper conduct on the part of his wife which led to most serious altercations between them. Only a month before she was found dead in a closet in her apartment, the appellant had attacked her on the street with a knife and threatened, if he did not then attempt to kill her. Upon a policeman being called, he found her barricaded in her home and the appellant endeavoring to assault her with a heavy steel instrument. Although arrested and a charge of assault with a deadly weapon lodged against him, Mrs. Shaver refused to prosecute, and the action was dropped. The body of Mrs. Shaver when found in the closet was covered with the wounds already described. The nature of these wounds indicate that they were inflicted with a deliberate and premeditated intent to take her life. Had there been only one bruise on her head, or a single knife cut on her body, it might perhaps be inferred that her death was accidental or was the result of a sudden quarrel or was committed by one in the heat of passion. But when the evidence shows that her head was virtually covered with contused wounds, sufficient to cause her death, and the remaining parts of her body had numerous wounds made with a knife or other sharp instrument, at least five of which were so serious that any one of them would have caused her death, we can only conclude that her assailant deliberately intended to take her life. (*People* v. *Ottey,* 5 Cal. (2d) 714, 720

[56 Pac. (2d) 193].) As to appellant's connection with the death of his wife, putting aside his own admission of the crime, the evidence shows that although he had been living in the same apartment house in which his wife was then living, immediately after the crime he dropped out of sight entirely, and it was only after a year and a half search that he was located in Seattle, Washington, and charged with the crime, to which charge he made no denial. With this damaging evidence against him, he refused to take the witness stand at his trial and deny any of the charges against him. This evidence was sufficient to justify a verdict of murder in the first decree. (*People* v. *Murphy*, 1 Cal. (2d) 37 [32 Pac. (2d) 635], *People* v. *McQuate*, 2 Cal. (2d) 227, 233 [39 Pac. (2d) · 408], and *People* v. *Ottey, supra.*) However, the case is made much stronger against the appellant when we consider his own admissions that he killed his wife with his own hand, and immediately fled from the scene of the crime. The jury was perfectly justified in accepting those portions of the appellant's statement which appeal to them while rejecting those that they did not believe. (*People* v. *Murphy*, 1 Cal. (2d) 37, 40.) With this evidence before us, we are not able to bring ourselves to the conclusion that the judgment against the appellant should be reduced to murder in the second degree.

It is not necessary for us to discuss at any length the three cases relied upon by appellant in which there was a reduction of the judgment. The case of *People* v. *Kelley, supra,* has been given consideration in our opinion in the case of *People* v. *Murphy, supra.* The language used in the opinion in the Murphy case is quite pertinent to the instant case, the two cases having many points of similarity. The other two cases relied upon by appellant are *People* v. *Howard, supra,* and *People* v. *Connors, supra.* In those cases the judgments were reduced from murder in the first degree to murder in the second degree for the reason that if the jury should reject the statement of the defendant as to the manner in which the deceased met death, then there would be a dearth of evidence tending to show the conditions as they existed at the time of the homicide from which it might be reasonably held that the murder was in fact wilful, premeditated, and intentional. No such condition exists in the present case as we have shown that if we

exclude the entire statement of the appellant, there is then sufficient evidence to show him guilty of murder in the first degree. The instant case is much like the case of *People* v. *McQuate, supra,* where the two cases of *People* v. *Howard* and *People* v. *Connors, supra,* are discussed and distinguished from the McQuate case.

An examination of the entire record in this case shows that it is singularly free from error, and a consideration of the facts proven and the law applicable to those facts convinces us that the appellant was legally convicted of the crime charged, and that the judgment against him and the order denying motion for a new trial should be affirmed.

It is so ordered.

Thompson, J., Langdon, J., Waste, C. J., Seawell, J., and Shenk, J., concurred.

Rehearing denied.