[Crim. No. 5262. In Bank. Feb. 19, 1952.]

THE PEOPLE, Respondent, v. DIAMOND REED, Appellant.

William T. Belcher, Jr., for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, J. F. Coakley, District Attorney (Alameda) and John S. Cooper, Deputy District Attorney, for Respondent.

EDMONDS, J.—Diamond Reed, with a record of two prior felony convictions which are admitted by him, was found guilty of the murder of Flyzella Braggs. Following the denial of his motion for a new trial, the death sentence was imposed in conformity with the verdict of the jury. The principal points presented upon the appeal from the judgment, automatically before this court (Pen. Code, § 1239b), concern the sufficiency of the evidence to support the verdict and the instructions to the jury.

The record shows testimony which may be summarized as follows:

On Christmas Eve, Reed sought out Theopolis Cain, an acquaintance. Reed and Cain joined Flyzella at the Sundown Café in Oakland. Flyzella asked the two men to drive her to the home of Dorothy Bucanon. When they arrived, she, and later Reed, went into Mrs. Bucanon's apartment.

After a short time, Reed and Flyzella returned to the car and asked Cain to drive them to another address. Flyzella entered this house and the two men again remained in the car. Soon after, Reed joined her. Matthew Butler also was there. A few minutes later, Reed and Flyzella returned to the automobile. Butler followed and watched them get into the front seat of the car. According to both Cain and Butler, Flyzella and Reed were quarreling and Reed grasped Flyzella about the neck with his hands.

Cain let Flyzella out on the left side of the car and she asked him to take Reed away because he was trying to hurt her. Reed jumped out of the car from the right-hand side and followed Flyzella into the house.

Shortly thereafter, about 2:30 or 2:45 a. m., Minnie Lee Ford, whose home faced Prescott Junior High School, heard a woman's screams coming from the direction of the school.

Some 12 hours later Flyzella's body was found. She was lying face down between two of a group of small wooden

buildings in the Prescott Junior High School yard. Her underpants had been removed and were lying across her legs. Other portions of her clothing had been disarranged. Her shoes were found at some distance from the body. All gates to the school grounds except one located at the northeast corner were closed and locked.

The findings upon an autopsy were that death was caused by subarachnoid hemorrhages with injury to the brain, accompanied by multiple fractures of the skull. External lacerations and abrasions on the head indicated that the wounds were made by a blunt instrument. There were spermatazoa in the vaginal tract.

Blood was found on the shoes which Reed was wearing on Christmas Eve. Soil samples taken from them and those worn by Flyzella were analyzed by a mineralogist of the Federal Bureau of Investigation. He testified that, in his opinion, the soil found on Reed's left shoe and that on both of Flyzella's came from the direct route between the only open gate of the schoolyard and the place where the body was found. His conclusions were based upon comparisons of the shoe soil with samples taken on the school premises and also from the ground at Reed's home, at Cain's home, at Butler's home and at the places where Flyzella's shoes and her body were found.

Cain testified that he met Reed sometime after 8 o'clock on Christmas Eve in front of Cain's house. Reed wanted to go riding and asked Cain to drive him to the Sundown Café in Oakland to find Flyzella. Cain said that he and Reed rode around for some time, stopping at the Sundown Café three times. They finally found Flyzella there sometime after midnight. While they were riding around looking for Flyzella, Reed told Cain he wanted to pick up a girl that night. According to Cain, Reed said that he had taken Flyzella out recently and she had only kissed him; ". . . he hadn't had anything to do with her yet, but if he kept going with her, he would."

Other testimony of Cain was that they remained at the Sundown Café until about 1 a. m. The three of them then left and Flyzella directed him to the homes of two friends whom she wished to visit. At the first stop, Flyzella got out of the automobile and went into the house. He and Reed remained in the car. Cain said that he dozed off to sleep, but thought that Reed got out of the car to look for Flyzella. Later he recognized Reed and Flyzella getting back

into the car. They asked him to take them to the second friend's house.

There, Cain testified, Flyzella went into the house. About 15 minutes later, Reed left. After a few minutes, Flyzella and Reed came out of the house, followed by another man. Continuing his account of what took place, Cain said that Flyzella and Reed got into the front seat of the car with Cain and started scuffling. Reed had his hands around Flyzella's neck. The man who followed them from the house tried to open the car door. Cain got out of the car and let Flyzella out on his side. Then Reed left the car and followed Flyzella into the house. The man who was standing beside the car went into the house behind them.

At no time while at this house, said Cain, was he asleep. He placed the hour when the three left him as being about 2 a. m. He said that he then drove home. This was the last time he saw Flyzella alive. He did not see Reed again that night.

Mrs. Bucanon told the jury that Flyzella came into the house about 1:30 a. m. and remained for an hour or more. Approximately 15 minutes later, Reed joined them. According to Mrs. Bucanon, Reed and Flyzella both appeared sober; there was no trouble, just friendly conversation.

Butler testified that Flyzella came into his room at 1:15 a. m. and woke him up. Reed followed her. Butler got up and went to the bathroom. When he returned to his room, they had left. Butler looked out and saw Reed and Flyzella entering a car. When he got to the car, he looked in and heard Flyzella tell Reed, "Stop choking me." Reed then had his right hand on Flyzella's neck. Butler said he tried to see the face of the man driving the car but could not do so.

After observing the scuffle, Butler said, he returned to the house and went to bed. Shortly thereafter, he heard the sound of a skirmish in the hall and Flyzella saying, "You don't have to be beating and choking on me, because you are not my man." Butler again got up, put on his shoes and coat, and went to the door. Flyzella and anyone with her had then disappeared and he saw no car.

Butler told the jury that before going home on Christmas Eve, he consumed a couple of bottles of beer. At home, he and a friend drank about a third of one pint of wine and part of another pint. He had been drinking earlier in the day. He was not intoxicated nor did he pass out; he was

"just sleepy." He went to sleep about 11 p. m. while his friend was still in the room. Sometime thereafter his friend left.

Lillian Scoby, one of the owners of the house in which Butler lived, related a conversation with him which she said occurred a few days after Christmas. She asked Butler whether Flyzella had visited him. Butler replied, "I didn't know anything about it because I was high . . . Drunk . . . I didn't see the license of the car or them, hardly, myself, because I was too high."

John E. Davis, of the Oakland Police Laboratory, testified to collecting the soil samples and the places from which they were taken. He made no examination of Flyzella's clothing at the place where her body was found. At a later date, he said, some of her clothing was brought into the laboratory from the property clerk's office and he then examined it. When received by him, Flyzella's underpants were wrong-side out. There were apparent seminal stains on them which he did not examine completely.

Davis gave the jury the conclusions he reached when he examined the underpants. In his opinion, Flyzella replaced them after having had intercourse and they were later pulled off inside out. He assumed that the underpants were inside out before they were put into the property clerk's office, that the stains actually were semen stains, that they were on the inside of the garment, and that intercourse had occurred.

The police officer who arrested Reed on December 27th testified that there were then two scratches on Reed's face. According to Butler, Reed's face was not scratched on Christmas Eve, but he noticed that condition when he saw Reed in jail.

Anna Belle Branch testified that during the afternoon of December 24th, Reed accompanied her on a visit to a sick friend. During the call they scuffled on the bed and tried to hold Reed's head down. Reed may have been scratched at that time, she said. She had no recollection of such an occurrence but the sick girl's fingernails were long.

It appears that, about one week before the homicide, Reed was employed to work in the kitchen of the Prescott Junior High School cafeteria at a club dinner. The cafeteria is near the only entrance to the schoolyard which was open on the evening of the homicide.

Cecil Massie was a prisoner in the Oakland City Jail when

Reed was arrested. At a witness for the State, Massie related a conversation with Reed. At that time, said Massie, Reed told him he had killed a girl. According to the witness, Reed admitted having had sexual intercourse with her. Reed asked him to go to his house and remove some bloody clothing. Massie testified that Reed repeated the same story to him in the jail on March 31st.

At the trial, Reed took the stand in his own behalf. He testified that during the afternoon of December 24th, he and Anna Branch visited one of her friends who·was ill. The three of them were "tussling" and "the skin was knocked off" of a facial bruise. Later he went to the Sundown Café, leaving there sometime between 7 and 8 p. m.

Continuing with his testimony, he said that he then picked up a streetwalker, went to a hotel with her for about half an hour, leaving sometime between 8 and 9 p. m. After looking for Cain, and not finding him, he kept walking around town. About midnight, he returned to the Sundown Café, where he found Cain and Flyzella together.

After the three talked for a few minutes they left in Cain's car. Cain then suggested that Flyzella find another girl so they could celebrate. Flyzella directed them to the home of a friend where she thought she could find a girl.

Reed did not recall the time spent there, but eventually he and Flyzella returned to the car and woke up Cain. Flyzella then directed them to the house of another friend. She went in, leaving the men in the car. About five or ten minutes later, when Reed went into the house, he met Butler coming back from the bathroom. A few minutes later he heard Flyzella talking in Butler's room but he did not go into it. He continued back to the car where he found Cain asleep. When he closed the door, Cain roused and asked where Flyzella was. The two men sat there for about 10 minutes and Cain went back to sleep.

Reed said he was halfway dozing when headlights ·behind the car awakened him and he heard loud voices. He looked out and saw Flyzella and a man. Reed opened the car door and jabbed Cain to wake him up. The man with Flyzella had his hands on her neck, but loosened his grip slightly when he saw Reed.

As Reed related what then occurred, Flyzella told the man, "Turn me loose! Turn me loose! You are no man or husband of mine." At that time, Flyzella broke loose and returned to the house. The man went to his car, parked be-

hind Cain's, shut off his headlights, and then followed Fly-zella. Meanwhile, Cain awakened and asked what had occurred. Reed told Cain, "I don't know. I don't know who he is, but I know where I am going. I'm going home. You know my position, I don't want to get into trouble."

Reed then walked away from the car and Cain drove off. This was about 3:30 a. m. He then went to a place where, about 4 a. m., he had two orange sodas. Later he stopped in front of a restaurant, and returned home between 4 and 5 a. m.

Other testimony of Reed was that the week before Christmas he had been in the Prescott Junior High School yard looking for the entrance to a building where he had been asked to help serve a dinner. He walked through the entrance at the northeast corner, which was the only one open. Not finding any door into the building at that point, he returned to the street and located a street door which he entered. The last time he saw Flyzella was about 3:30 a. m. on Christmas morning. He did not kill her, and he never had sexual intercourse with her.

Admitted into evidence during the trial was a photograph of Flyzella's body taken at the scene where it was discovered. It shows the position of the body when found and the disarrangement of the clothing.

Following the presentation of evidence, the jury was given the statutory definitions of murder of the first degree, murder of the second degree, manslaughter, rape, and malice. The record also includes instructions concerning the elements of an attempt to commit a crime. In addition, the jurors were instructed as to the rules relating to intent, manslaughter and heat of passion. The difference between, and elements of, the various degrees of homicide were explained and the court defined an assault which amounts to a felony.

Reed contends that these instructions are insufficient. He says that they do not adequately cover rape, or attempted rape, and homicide. Nor do they, he says, state the facts necessary to be proved to establish the commission of each of these crimes.

The court instructed the jury regarding the law applicable to the facts shown by the evidence. The instructions given are couched both in the statutory language and in additional explanatory terms. Reed does not claim that any of the instructions are erroneous and no instruction requested by him was refused.

"Where an instruction on a particular point or points as given by the court is correct as far as it goes, and the only valid objection, if any, to it is that it is deficient or inadequate by reason of its generality, indefiniteness, or incompleteness, if defendant desires additional, amplified, explanatory, fuller, or more complete, elaborate, comprehensive, definite, specific or explicit instructions on such point or points, he must properly request the same, otherwise error cannot be predicated upon the failure to give such additional instruction." (*People* v. *Carothers,* 77 Cal.App.2d 252, 255 [175 P.2d 30].)

■ The court may couch its instructions defining the elements of the offense in the language of the code where no instructions in elaboration or exposition of the principles of the statutory definitions are requested by the defendant. (*People* v. *Treschenko,* 159 Cal. 456, 458 [114 P. 578].) Even if such an instruction "cannot be commended as a full or clear exposition of the meaning of the section of the code, still it cannot be said that it was error for the court in giving the law to have conformed to the language of the code, and to have omitted what that code itself omits." (*People* v. *Dobbins,* 138 Cal. 694, 698 [72 P. 339].) The defendant will not be heard to complain where he has failed to request an amplification of an instruction in that form. (*People* v. *Laird,* 69 Cal.App. 511, 514 [231 P. 596].)

■ The court's instruction on the presumption of innocence and defining reasonable doubt followed the language of section 1096 of the Penal Code. By additional instructions, the court explained the effect of the presumption and stated the doctrine of reasonable doubt.

These instructions, Reed complains, are only general. No instruction was given to the effect that each element of the crime must be proved beyond a reasonable doubt. But the law expressly specifies that the court may read section 1096 of the Penal Code and need not give any other instruction on the presumption of innocence or reasonable doubt. (Pen. Code, § 1096a.) Considering all of the instructions, it appears that the jury was fully and fairly instructed as to all of the rules of law applicable to the evidence.

Reed next contends that, as a matter of law, the evidence is insufficient to support the verdict of guilty of murder of the first degree. He argues that, by the evidence presented, the prosecution's case is limited to the theory of murder committed in the perpetration of rape. This, he says, the

prosecution has failed to prove beyond a reasonable doubt. Reed relies upon the testimony of Davis, given on cross-examination, as proving intercourse by consent.

■ Circumstantial evidence is as sufficient to convict as direct evidence. (*People* v. *Koenig*, 29 Cal.2d 87, 91 [173 P.2d 1]; *People* v. *Hills*, 30 Cal.2d 694, 700 [185 P.2d 11]; *People* v. *Green*, 13 Cal.2d 37, 42 [87 P.2d 821]; *People* v. *Latona*, 2 Cal.2d 714, 721 [43 P.2d 260].) ■ "It is not the province of this court to determine conflicts in the evidence, nor to choose between different inferences which reasonably may be drawn from the testimony. The sole question, so far as the admissible evidence is concerned, relates to its sufficiency to support the verdict. . . . The ultimate fact found by the trial court was that defendant was guilty of murder of the first degree. If there is substantial evidence in the record to support that judgment, the determination must be upheld." (*People* v. *Hills, supra*, p. 701; *People* v. *Eggers*, 30 Cal.2d 676, 685 [185 P.2d 1]; *People* v. *Smith*, 15 Cal.2d 640-647 [104 P.2d 510]; *People* v. *Green, supra*, p. 42; *People* v. *Perkins*, 8 Cal.2d 502, 510 [66 P.2d 631]; *People* v. *Latona, supra*, p. 722; *People* v. *Tedesco*, 1 Cal.2d 211, 219 [34 P.2d 467]; *People* v. *Tom Woo*, 181 Cal. 315, 326 [184 P. 389]; *People* v. *Rico*, 180 Cal. 385, 386 [181 P. 663]; *People* v. *Machuca*, 158 Cal. 62, 64 [109 P. 886]; *People* v. *Mahatch*, 148 Cal. 200, 203 [82 P. 779].)

■ Applying this rule to the record in this case, and conceding that the prosecution is limited to the theory of murder committed in the perpetration of rape, it cannot be said "that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below." (*People* v. *Tom Woo, supra*.) Flyzella was found dead as the result of violence. There is evidence tending to prove that sexual intercourse had been accomplished. The jury was not required to conjecture that the intercourse had been with consent.

A reasonable inference to be drawn from the evidence is that Flyzella offered resistance and was raped. There is direct evidence of Reed's expressed intentions and that earlier he had used violence upon her. The evidence concerning his admission of the crime also tends to prove his guilt. Considering the entire testimony, it amply supports the implied finding of the jury that Reed killed Flyzella in the perpetration of rape.

■ Reed objects to the admission of certain photographic evidence. In particular, he contends that the admission of a photograph of Flyzella's body as found was inflammatory and prejudicially erroneous. It should not have been admitted, he argues, because there was other evidence showing the nature and extent of the wounds and the location of the body. However, there is ample authority for the ruling of the court in this regard. (*People* v. *Guldbrandsen,* 35 Cal.2d 514, 522 [218 P.2d 977]; *People* v. *Smith, supra,* p. 649; *People* v. *Shaver,* 7 Cal.2d 586, 592 [61 P.2d 1170].

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.