[Crim. No. 3342. First Dist., Div. Two. Oct. 22, 1957.]

THE PEOPLE, Respondent, v. BETTY TODD, Appellant.

Smith & Parrish and Shannon Parrish for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Marvin J. Christiansen, Deputy Attorney General, for Respondent.

KAUFMAN, P. J.—The defendant Betty Todd was charged with the murder of her husband, Solomon Todd. The jury returned a verdict of guilty of murder in the first degree, which was changed to murder in the second degree by the trial court pursuant to its authority under Penal Code, section 1181.

On this appeal taken from the judgment and the order denying defendant's motion for a new trial, it is contended that the evidence is insufficient to support the judgment, that the trial court erred in not permitting the defense to show before the jury that counsel advised the defendant not to testify and in allowing alleged prejudicial misconduct by the district attorney.

The record contains testimony which may be summarized as follows: Oakland Police Officer Lathrop testified that on Sunday, August 13, 1956, at 7:03 a. m. he received an emergency call, and proceeded to 3259 Peralta Street, the home of the defendant and her husband. Arriving at 7:10 a. m., he was directed into the house by Mrs. Williams, the defendant's sister. He further testified: "Well, I walked to the door and I saw Mr. Todd lying on the Chesterfield and Mrs. Todd walking toward the front room—through another sitting room towards the front room where I was. And I walked up to Mr. Todd and checked his pulse and respiration and he was not breathing and had no pulse at that time.

"And Mrs. Todd was in the living room by that time and I asked her what had happened and she held out a beer can opener and she said, 'I stabbed him hard with this.' I took the beer can opener that she offered to me from her and put it in my pocket." The deceased was wearing a blood stained T-shirt with a small hole in it; a dark coat and pink shirt were lying on the bed in the front bedroom. The bed appeared to have been slept in. Officer Lathrop found no holes or stains in the pink shirt or coat. He further testified that the defendant then told him that her husband had come in drunk about 6 a. m., and after she asked her husband where he had been and he refused to answer a fight had started between them; that, during the struggle, her husband had hit her on the head and had "gigged at her with something." The defendant did not have a bruise on her head nor did her clothing appear to have been in a fight. The furniture in the apartment did not appear to have been disturbed. The officer thoroughly searched the premises and found no other weapon. There was no blood on the beer can opener.

The testimony of the doctor who performed the autopsy disclosed that Solomon Todd died of a cardiac tamponade due to a stab wound which entered a branch of the coronary artery. The wound was about 4½ inches deep and could not have been made by a beer can opener but only by a long sharp instrument such as an ice pick or butcher knife or scissors.

In a subsequent experiment on a body the doctor was unable to produce a similar wound with a beer can opener. The wound could have been inflicted anywhere from three minutes to five hours before the death and was of such a nature that it would not have caused pain and would have enabled the deceased to appear normal and walk around for a considerable period of time without knowing he had been hurt. The blood of the deceased had an alcohol measurement of .196, a sufficiently high percentage to indicate that the deceased was under the influence of alcohol. The autopsy also revealed three recently incurred superficial lacerations which could have been caused by a beer can opener or fingernail. A microscopic diagnosis of the wound tract revealed the presence of polymorphonuclear leukocytes which are generated only if a person lives after the infliction of a wound and normally do not appear until three hours after a wound has been inflicted.

The activities of the deceased during the hours before his death were as follows: after 4 p. m. on the afternoon of Saturday, August 12, wearing a dark suit and pink shirt, Todd went to the home of Frank Wright, a friend and coworker at the cannery, who lived nearby. Around 5 p. m. the two men left Wright's residence in Wright's car and proceeded to Allen's Café, which was a short distance from the Todd home. There they drank beer, ate hamburgers and played records until midnight. Around midnight, Todd left his friend, stating he was going next door to the Victory Club and would return shortly. Wright, who had been on similar jaunts with Todd in the past and knew Todd to be a heavy drinker, waited at Allen's Café until after 2 a. m. Then, fearing that Todd might have been "rolled" as on a prior occasion, Wright searched for Todd at his home, at the Victory Club and other haunts, giving up the fruitless search at 5 a. m. Wright testified that during the course of the evening Todd had not been in any fights.

Shortly after 1 a. m., Todd (who never left Allen's Café), apparently unseen by Wright, joined the table of another coworker at the cannery, Lonnie Durham who had not previously been friendly with Todd. On the Saturday evening in question, Durham was at Allen's Café with his wife, Margie, and his sister-in-law, Mrs. Raymond. Durham introduced Todd to his companions. Sometime before 2 a. m. the foursome left Allen's Café in the Durhams' car to obtain some whiskey. After obtaining a half pint of whiskey which was consumed by all four of them, they drove to several other cafés, all of

which were closed. At 24th and Market Streets, they finally found a place which was open, obtained another half pint of whiskey, which was consumed chiefly by the two men, and some coffee. As they were leaving, they noticed that the car had a flat tire. While they were having the tire fixed at a filling station on Market and San Pablo, Todd went to the rest room for five to ten minutes. The foursome then proceeded to a barbecue place on 7th and Market Streets, and ate. As it was after 4 a. m. by then, Todd asked to be taken home, saying he had to work two shifts the following day. He was taken home in the Durham car, with Mr. and Mrs. Durham sitting in the front seat, Mrs. Durham driving, and Todd and Mrs. Raymond sitting in the back seat. As the car pulled up in front of Todd's home, they noticed a car parked in front of the house and Todd said, "There is my car there." ". . . that's my wife. Keep driving." The car proceeded to follow them and Mrs. Durham kept on driving for some distance until the car ceased to trail them. They then dropped Todd at 30th and Peralta about a block from his home around 5 a. m. Todd began to walk in a direction away from his home. After dropping Todd, Mr. Durham took the wheel and drove by the Todd home. The car which had previously been trailing them began to follow them again, subsequently pulled up alongside, and a lady in an angry tone said, "Where's Todd?" When Mr. Durham replied, "What Todd?" she said, "You wasn't the one driving," and drove off. The Durhams and Mrs. Raymond then drove home and never saw Todd alive again. Both of the Durhams as well as Mrs. Raymond testified to all of the above facts as well as to the fact that Todd did not appear drunk, was in a good humor, and had not been in any fights in the course of the evening.

Todd was next seen walking toward his home between 6 and 6:15 a. m. by Mrs. Eliza Walker who lived in the apartment below the Todds and usually left for work at that time. Mrs. Walker testified that Todd was walking as if he had "a couple of drinks," was "happy as a field ox" and spoke to her in a friendly fashion and did not complain about having been stabbed. He was still wearing his pink shirt and dark coat.

Defendant's first contention on appeal is that there is not substantial evidence to support the judgment of murder in the second degree. Penal Code, section 1105, provides as follows: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves

upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.''

The first question, therefore, is whether in the instant case the proof indicates a homicide by the defendant. There is no question as to the existence of a homicide here as the deceased died as a result of a stab wound. ■ The evidence which tends to show that the defendant killed her husband is entirely circumstantial. Therefore, the facts or circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion. (*People* v. *Bender*, 27 Cal.2d 164 [163 P.2d 8].) The defendant contends here that the testimony of the expert who performed the autopsy is consistent with her theory that the wound could not have been inflicted by the beer can opener, and was inflicted several hours before the deceased arrived home, probably during the time the deceased was with the Durhams or during the hour which elapsed after he had been last seen by the Durhams and was first seen by Mrs. Walker. The lack of any stains or tears in the pink shirt and coat does not support the defendant's theory. Furthermore, the jury could disbelieve the testimony of the expert witness. The defendant did not offer any evidence to rebut that offered by the prosecution. It is not for this court to determine conflicts in the evidence or to choose between different inferences which may be reasonably drawn from the evidence. If there is substantial evidence in the record to support the judgment of the trial court, the judgment must be upheld. (*People* v. *Reed*, 38 Cal.2d 423 [240 P.2d 590].) We conclude, therefore, that this is a proper case for the application of Penal Code, section 1105.

■ The next question is the more difficult one of the degree of the homicide. ''Murder,'' as defined in Penal Code, section 187, ''is the unlawful killing of a human being, with malice aforethought.'' Penal Code, section 188, provides: ''Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.'' The effect of sections 187-189 and Penal Code, section 1105, construed together, is that every killing is murder unless the defendant proves the contrary. (*People* v. *Wells,* 10 Cal.2d 610 [76 P.2d 493].)

Penal Code, section 189 provides: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree."

■ The difference between murder in the first degree and murder in the second degree and manslaughter was well explained by the court in *People* v. *Bender, supra,* 27 Cal.2d 164 at 181 and 182:

"1. Manslaughter . . . a willful act . . . characterized by the presence of an intent to kill engendered by sufficient provocation and the absence of premeditation, deliberation, and (by presumption of law) malice aforethought.

■ 2. Murder of the second degree: a willful act characterized by the presence of malice aforethought and, at least ordinarily, by the specific intent to kill, and by the absence of premeditation and deliberation.

■ 3. Murder of the first degree: a willful act characterized by the presence of malice aforethought and by a deliberate and premeditated intent to kill, or by one of the means, or by the perpetration or attempt to perpetrate one of the felonies, enumerated in the statute."

■ In the instant case the homicide could not be murder of the first degree as there is no substantial evidence from which it can be reasonably inferred that the killing was deliberate and premeditated. Therefore, the trial court properly exercised its discretion in modifying the verdict of murder in the first degree reached by the jury. ■■ As stated in *People* v. *Cesena,* 18 Cal.App.2d 727 at 729 [64 P.2d 732]: "In giving consideration to the important matter of the sufficiency of the evidence to support the jury's verdict, the trial court, in ruling on a motion for a new trial, is not bound by conflicts in the evidence (*Moyer* v. *Dresch,* 2 Cal. App.2d 655 [38 P.2d 849]), and the duty is imposed upon it then to consider such additional and not unimportant features as the credibility of witnesses, their manner and appearance in testifying, and the proper weight to be accorded to the evidence. While the solemn verdict of a jury should not lightly be vacated the responsibility nevertheless rests with the court again to review the cause and only after such review to decide the application for a new trial. (*Olinger* v. *Pacific Greyhound Lines,* 7 Cal.App.2d 484 [46 P.2d 774].) If such

review produces a conviction of evidentiary insufficiency to support the verdict it is the plain duty of the trial court to set it aside and order a new trial (*People* v. *Bacos,* 14 Cal.App. 2d 338, 349 [58 P.2d 221].)''

The question, therefore, is whether the trial court properly exercised its discretion in denying the motion for a new trial and reducing the offense to murder in the second degree. The gist of the defendant's argument is that there was no evidence of malice. ■ However, as pointed out in *People* v. *Ross,* 34 Cal.App.2d 574 at 578 [93 P.2d 1019], in murder of the second degree, the fact of malice is implied from the unlawful killing. ■ Defendant offered no evidence of provocation or sudden passion, as was present in the cases chiefly relied upon by her, *People* v. *Bridgehouse,* 47 Cal.2d 406 [303 P.2d 1018] and *People* v. *Kelley,* 208 Cal. 387 [281 P. 609]. (See also *People* v. *Sheran,* 49 Cal.2d 101 [315 P.2d 5].) According to the testimony of the police officer, the defendant admitted stabbing her husband with the beer can opener. In *People* v. *Semone,* 140 Cal.App. 318 at 323 [35 P.2d 379] the court said: ''When an unlawful act which results in death is deliberately performed by an assailant who knows that his conduct endangers the life of another, and it is executed without provocation or sudden passion, which would reduce the offense to manslaughter, malice is presumed. Under such circumstances the killing constitutes murder of the second degree . . .'' We are, therefore, in agreement with the respondent's argument that neither *People* v. *Kelley* or *People* v. *Bridgehouse, supra,* are proper authority for holding in the present case that the defendant was as a matter of law guilty of only manslaughter. Penal Code, section 1181, subsection 6, provides as follows: ''When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed.'' ■ In construing this section our Supreme Court said in *People* v. *Thomas,* 25 Cal. 2d 880 at 904 and 905 [156 P.2d 7] : ''While the *power* granted to the appellate court is equal to that given the trial court the circumstances which will justify its exercise in a particular court are those which are appropriate to typical functioning of that court. In other words, upon an application to

reduce the degree or class of an offense, a trial judge may review the *weight* of the evidence but an appellate court should consider only its *sufficiency as a matter of law.*''

We do not think that in the instant case the evidence is legally inadequate to support a judgment of murder in the second degree.

Defendant's second contention on appeal is that the trial court erred in not permitting her to show before the jury that counsel advised her not to testify. Defendant relies on *People* v. *Simmons,* 28 Cal.2d 699 [172 P.2d 18] and *In re Plummer,* 79 Cal.App.2d 651 [180 P.2d 771], neither of which appear applicable here. Defendant also contends that the trial court erroneously refused her proffered instructions on this matter and in permitting the comment of the district attorney on defendant's failure to take the stand. In this matter the jury was instructed as follows:

''It is a constitutional right of a defendant in a criminal case that she not be compelled to testify. Thus, whether or not she does testify rests entirely in her own decision. As to any evidence or facts against her which the defendant can reasonably be expected to deny or explain because of facts within her knowledge, if she does not testify, the jury may take that failure into consideration as tending to indicate the truth of such evidence, and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable.

''The failure of a defendant to·deny or explain evidence against her does not, however, create a presumption of guilt, or, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt.

''In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence, and upon the failure, if any, of the People to prove every essential element of the charge against her, and no lack of testimony on defendant's part will supply a failure of proof by the People so as to support by itself a *failure* finding against her on any such essential element.''

The above instructions were proper, and there was no error in the denial of defendant's proposed instructions. In this state, the failure of the defendant to explain or deny his testimony may be commented on. (Cal. Const., art. I, § 13;

art. VI, § 19; Pen. Code, § 1323; *People* v. *De Paula*, 43 Cal. 2d 643 [276 P.2d 600].) In ruling on the motion for a new trial the court admitted affidavits showing that defendant was advised not to testify by her attorney, so that the matter was properly considered by the court in ruling on the motion. Nor can we see that the defendant here has in any way been prejudiced in not being permitted to place the matter before the jury. Rather it would appear to introduce only collateral matters. There is, therefore, no merit as to defendant's second contention.

Defendant's third and final contention on appeal is that the presence of prejudicial misconduct by the district attorney necessitates reversal.

 The first of these took place after defendant's counsel argued that the pink shirt worn by the deceased was not produced in evidence. The district attorney in his argument replied as follows: "That shirt had no marks on it at all, nor the coat. Counsel says, 'Why isn't it here?' 'It had been examined.' You know where it is? It was buried with Sollie Todd, that's where it is. Do you think that I am not telling you the truth. You have his body externed and you will find that pink shirt and the coat." The following colloquy then took place:

"MR. PARRISH: Counsel's argument is outside the record.

"THE COURT: Yes.

"MR. VUKOTA: He asked the remark, he said, 'Where is the coat and the shirt? Why isn't it here?' I'm just answering his remark.

"THE COURT: No, but you cannot speculate on what the exhibits would show if they had been introduced in evidence which were not introduced in evidence.

"MR. VUKOTA: Oh, wait a minute, your Honor—one officer, Mr. Lathrop, testified that he saw the coat and the shirt on the bed, and—correct me if I'm wrong—he said he looked at it, examined it, there were no tears or marks of blood on the coat or shirt. He said they were laying on the bed.

"MR. PARRISH: Your Honor, you may have missed the point of my objection. I—he was telling this jury that it was interred with Mr. Todd. There is no evidence to that effect whatsoever.

"MR. VUKOTA: You asked where it was. I thought I would tell you, to save you from worrying about it.

"MR. PARRISH: Well, maybe I will get a ruling.

"THE COURT: The jury will be instructed that counsel can't tell you things like that. Counsel could take the witness stand if he wanted to explain the absence of any object, if he thought it was necessary to do so. But you cannot speculate what a witness would have testified to had he taken the witness stand."

In view of the court's subsequent instruction to the jury to disregard the statement and the right of the prosecution to reply to an erroneous assertion of fact made by defense counsel, while erroneous, there was no prejudice to the defendant in this statement.

The second relates to the weight of the defendant, which defendant's attorney in his argument suggested was about 100 pounds. In reply, the district attorney agreed, "You want to know her actual weight? One hundred and twenty-six pounds." There was no objection made to this remark. Furthermore, the statement was prompted by defendant's counsel when he asked the defendant to stand up in front of the jury and said: "This is the defendant. This is Betty Todd. And he wants you to think that this little girl— I look at her, you look at her; I estimate her weight at around 100 pounds. It may be more or it may be less. She's about five foot four and a half. And that strong boy there, she's supposed to have done him in. A big roustabout laborer, 177 pounds, healthy as a field ox, and he comes home with a load of booze and he gets in a fight with this little girl, and she's supposed to have murdered him." Furthermore, any harm to the appellant resulting from the statement was negated by the fact that the defendant was in view of the jury (*People* v. *Lama*, 129 Cal.App.2d 391 [276 P.2d 816]) and the court's subsequent instruction.

The third relates to the following remark of the district attorney in his argument: "And when the doctor said it was an icepick, or something similar to that, he said 'an icepick, or a sharp pair of scissors, or a knife,' and he didn't eliminate other similar instruments. He wasn't fooling. She used an icepick, and she knows how to use one." As defendant did not object to this matter it cannot now be raised on appeal. (*People* v. *Codina*, 30 Cal.2d 356 [181 P.2d 881].)

The fourth relates to the following argument made by the district attorney: "If your child or your spouse has pains in the side, the right side, and you think an appendectomy should be performed, do you call the Police Department—and would they come up? And then would you say, 'I stabbed him,' if you didn't do it?

██ "Now, we don't need eye witnesses. If we did, nine-tenths of our cases you wouldn't have any alternative but to find them not guilty. And again let me state this to you, you're all aware of the amount of eye witesess that saw the killing in the Abott case." However, it is the rule that counsel may cite a famous case in order to demonstrate a part of his argument. (*People* v. *Johnson,* 99 Cal.App.2d 717 [222 P.2d 335].)

██ The fifth relates to the following statement by the district attorney: ". . . and they'll say, 'John Doe was killed. Go downstairs and try his best friend for murder.' We don't do it that way.

"When you're through with your jury service, if you want to travel around and see how we operate come on upstairs, in some of these cases, and see what is done. You're entirely welcome to. You can follow me around, and you'll see.

"Why didn't she take the stand and explain what occurred at home when he came home? Why did she say, 'I stabbed him' if she didn't? Which would be the more reasonable, a John Doe killed him, or did the defendant? All reasonable-ness, if you want to classify it as that, points to the defendant. In fact, from the evidence itself, proof is beyond all possible doubt that the person that took away Mr. Todd's life was his own wife, and nobody else.

"And I respectfully request that when you go up into the jury room, that you bring back a verdict of guilty of murder of the first degree . . ." Defendant also did not object to this remark and therefore waived the right to raise it on appeal. (*People* v. *Codina,* 30 Cal.2d 356 [181 P.2d 881].) *People* v. *Kirkes,* 39 Cal.2d 719 [249 P.2d 1], relied upon by the defendant, in which the district attorney stated his belief in the defendant's guilt, is not applicable here.

As indicated above, the district attorney's comment on defendant's failure to testify was proper.

██ The sixth and final one relates to the district attorney's comment on the failure of appellant's sister, Mrs. Williams, to testify. However, this remark was invited by the defendant's calling Mrs. Williams only to show she had been subpoenaed by the prosecution. In the case of *People* v. *Gonzales,* 151 Cal.App.2d 112 [311 P.2d 53], the district attorney was permitted to say that the testimony of a certain witness was absolutely false. It does not appear that the comment by the prosecution here was unfair under the circumstances. As further stated by the court in the Gonzales case,

*supra,* " 'The rule is established that unless the harmful results of misconduct of the district attorney cannot be obviated by appropriate instructions of the trial court, error cannot be predicated in this court on such alleged misconduct in the absence of (a) assignment of such misconduct as error; and (b) a request to the trial court to instruct the jury to disregard it.' " There is therefore no merit in defendant's third contention.

In view of the foregoing the judgment and order denying the motion for new trial must be affirmed.

Judgment affirmed.

Order denying motion for new trial affirmed.

Dooling, J., and Draper, J., concurred.